## CABAN *v.* MOHAMMED ET UX.

77–6431.   Argued November 6, 1978—Decided April 24, 1979

P", J., delivered the opinion of the Court, in which B,
W, M, and B, JJ., joined. S, J., filed a dissenting opinion, *post*, p. 394. S, J., filed a dissenting opinion, in which B, C. J., and R, J., joined, *post*, p. 401.

*Robert H. Silk* argued the cause and filed briefs for appellant.

*Morris Schulslaper* argued the cause and filed a brief for appellees.

*Irwin M. Strum,* Assistant Attorney General, argued the cause for the New York State Attorney General as *amicus curiae* urging affirmance. With him on the brief were *Louis J. Lefkowitz,* Attorney General, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Warren M. Goidel* and *Neil S. Solon,* Assistant Attorneys General.*

M. J P delivered the opinion of the Court.

The appellant, Abdiel Caban, challenges the constitutionality of § 111 of the New York Domestic Relations Law (Mc-

---

*Briefs of *amici curiae* urging reversal were filed by *Martin Guggenheim, Rena K. Uviller,* and *Bruce J. Ennis* for the American Civil Liberties Union; by *Louise Gruner Gans* for Community Action for Legal Services, Inc.; and by *John E. Kirklin* and *Kalman Finkel* for the Legal Aid Society of New York City.

Kinney 1977), under which two of his natural children were adopted by their natural mother and stepfather without his consent. We find the statute to be unconstitutional, as the distinction it invariably makes between the rights of unmarried mothers and the rights of unmarried fathers has not been shown to be substantially related to an important state interest.

I

Abdiel Caban and appellee Maria Mohammed lived together in New York City from September 1968 until the end of 1973. During this time Caban and Mohammed represented themselves as being husband and wife, although they never legally married. Indeed, until 1974 Caban was married to another woman, from whom he was separated. While living with the appellant, Mohammed gave birth to two children: David Andrew Caban, born July 16, 1969, and Denise Caban, born March 12, 1971. Abdiel Caban was identified as the father on each child's birth certificate, and lived with the children as their father until the end of 1973. Together with Mohammed, he contributed to the support of the family.

In December 1973, Mohammed took the two children and left the appellant to take up residence with appellee Kazin Mohammed, whom she married on January 30, 1974. For the next nine months, she took David and Denise each weekend to visit her mother, Delores Gonzales, who lived one floor above Caban. Because of his friendship with Gonzales, Caban was able to see the children each week when they came to visit their grandmother.

In September 1974, Gonzales left New York to take up residence in her native Puerto Rico. At the Mohammeds' request, the grandmother took David and Denise with her. According to appellees, they planned to join the children in Puerto Rico as soon as they had saved enough money to start a business there. During the children's stay with their grandmother, Mrs. Mohammed kept in touch with David and

Denise by mail; Caban communicated with the children through his parents, who also resided in Puerto Rico. In November 1975, he went to Puerto Rico, where Gonzales willingly surrendered the children to Caban with the understanding that they would be returned after a few days. Caban, however, returned to New York with the children. When Mrs. Mohammed learned that the children were in Caban's custody, she attempted to retrieve them with the aid of a police officer. After this attempt failed, the appellees instituted custody proceedings in the New York Family Court, which placed the children in the temporary custody of the Mohammeds and gave Caban and his new wife, Nina, visiting rights.

In January 1976, appellees filed a petition under § 110 of the New York Domestic Relations Law to adopt David and Denise.[1] In March, the Cabans cross petitioned for adoption. After the Family Court stayed the custody suit pending the outcome of the adoption proceedings, a hearing was held on the petition and cross-petition before a Law Assistant to a New York Surrogate in Kings County, N. Y. At this hearing, both the Mohammeds and the Cabans were represented by counsel and were permitted to present and cross-examine witnesses.

The Surrogate granted the Mohammeds' petition to adopt the children, thereby cutting off all of appellant's parental

---

[1] Section 110 of the N. Y. Dom. Rel. Law (McKinney 1977) provides in part:

"An adult or minor husband and his adult or minor wife together may adopt a child of either of them born in or out of wedlock and an adult or minor husband or an adult or minor wife may adopt such a child of the other spouse."

Although a natural mother in New York has many parental rights without adopting her child, New York courts have held that § 110 provides for the adoption of an illegitimate child by his mother. See In re Anonymous Adoption, 177 Misc. 683, 31 N. Y. S. 2d 595 (Surr. Ct. 1941).

rights and obligations.[2]   In his opinion, the Surrogate noted the
limited right under New York law of unwed fathers in adop-
tion proceedings: "Although a putative father's consent to
such an adoption is not a legal necessity, he is entitled to an
opportunity to be heard in opposition to the proposed step-
father adoption."   Moreover, the court stated that the ap-
pellant was foreclosed from adopting David and Denise, as
the natural mother had withheld her consent.   Thus, the
court considered the evidence presented by the Cabans only
insofar as it reflected upon the Mohammeds' qualifications as
prospective parents.   The Surrogate found them well qualified
and granted their adoption petition.

The New York Supreme Court, Appellate Division, affirmed.
It stated that appellant's constitutional challenge to § 111 was
foreclosed by the New York Court of Appeals' decision in
*In re Malpica-Orsini*, 36 N. Y. 2d 568, 331 N. E. 2d 486 (1975),
appeal dism'd for want of substantial federal question *sub
nom. Orsini* v. *Blasi*, 423 U. S. 1042 (1976).   *In re David
Andrew C.*, 56 App. Div. 2d 627, 391 N. Y. S. 2d 846 (1977).
The New York Court of Appeals dismissed the appeal in a

---

[2] Section 117 of the N. Y. Dom. Rel. Law (McKinney 1977) provides, in
part, that

"[a]fter the making of an order of adoption the natural parents of the
adoptive child shall be relieved of all parental duties toward and of all
responsibilities for and shall have no rights over such adoptive child or to
his property by descent or succession, except as hereinafter stated."

As an exception to this general rule, § 117 provides that

"[w]hen a natural or adoptive parent, having lawful custody of a child,
marries or remarries and consents that the stepfather or stepmother may
adopt such child, such consent shall not relieve the parent so consenting
of any parental duty toward such child nor shall such consent or the
order of adoption affect the rights of such consenting spouse and such
adoptive child to inherit from and through each other and the natural
and adopted kindred of such consenting spouse."

In addition, § 117 (2) provides that adoption shall not affect a child's
right to distribution of property under his natural parents' will.

memorandum decision based on *In re Malpica-Orsini, supra. In re David A. C.,* 43 N. Y. 2d 708, 372 N. E. 2d 42 (1977).

On appeal to this Court, appellant presses two claims. First, he argues that the distinction drawn under New York law between the adoption rights of an unwed father and those of other parents violates the Equal Protection Clause of the Fourteenth Amendment. Second, appellant contends that this Court's decision in *Quilloin v. Walcott,* 434 U. S. 246 (1978), recognized the due process right of natural fathers to maintain a parental relationship with their children absent a finding that they are unfit as parents.[3]

## II

Section 111 of the N. Y. Dom. Rel. Law (McKinney 1977) provides in part that

> "consent to adoption shall be required as follows: . . . (b) Of the parents or surviving parent, whether adult or infant, of a child born in wedlock; [and] (c) Of the mother, whether adult or infant, of a child born out of wedlock. . . ."

The statute makes parental consent unnecessary, however, in certain cases, including those where the parent has abandoned or relinquished his or her rights in the child or has been adjudicated incompetent to care for the child.[4] Absent one of

---

[3] As the appellant was given due notice and was permitted to participate as a party in the adoption proceedings, he does not contend that he was denied the procedural due process held to be requisite in *Stanley* v. *Illinois,* 405 U. S. 645 (1972).

[4] At the time of the proceedings before the Surrogate, § 111, as amended by 1975 N. Y. Laws, chs. 246 and 704, provided:

"Subject to the limitations hereinafter set forth consent to adoption shall be required as follows:

"1. Of the adoptive child, if over fourteen years of age, unless the judge or surrogate in his discretion dispenses with such consent;

"2. Of the parents or surviving parent, whether adult or infant, of a child born in wedlock;

these circumstances, an unwed mother has the authority under New York law to block the adoption of her child simply by withholding consent. The unwed father has no similar control

---

"3. Of the mother, whether adult or infant, of a child born out of wedlock;

"4. Of any person or authorized agency having lawful custody of the adoptive child.

"The consent shall not be required of a parent who has abandoned the child or who has surrendered the child to an authorized agency for the purpose of adoption under the provisions of the social services law or of a parent for whose child a guardian has been appointed under the provisions of section three hundred eighty-four of the social services law or who has been deprived of civil rights or who is insane or who has been judicially declared incompetent or who is mentally retarded as defined by the mental hygiene law or who has been adjudged to be an habitual drunkard or who has been judicially deprived of the custody of the child on account of cruelty or neglect, or pursuant to a judicial finding that the child is a permanently neglected child as defined in section six hundred eleven of the family court act of the state of New York; except that notice of the proposed adoption shall be given in such manner as the judge or surrogate may direct and an opportunity to be heard thereon may be afforded to a parent who has been deprived of civil rights and to a parent if the judge or surrogate so orders. Notwithstanding any other provision of law, neither the notice of a proposed adoption nor any process in such proceeding shall be required to contain the name of the person or persons seeking to adopt the child. For the purposes of this section, evidence of insubstantial and infrequent contacts by a parent with his or her child shall not, of itself, be sufficient as a matter of law to preclude a finding that such parent has abandoned such child.

"Where the adoptive child is over the age of eighteen years the consents specified in subdivisions two and three of this section shall not be required, and the judge or surrogate in his discretion may direct that the consent specified in subdivision four of this section shall not be required if in his opinion the moral and temporal interests of the adoptive child will be promoted by the adoption and such consent cannot for any reason be obtained.

"An adoptive child who has once been lawfully adopted may be readopted directly from such child's adoptive parents in the same manner as from its natural parents. In such case the consent of such natural parents shall not be required but the judge or surrogate in his discretion

over the fate of his child, even when his parental relationship is substantial—as in this case. He may prevent the termination of his parental rights only by showing that the best interests of the child would not permit the child's adoption by the petitioning couple.

Despite the plain wording of the statute, appellees argue that unwed fathers are not treated differently under § 111 from other parents. According to appellees, the consent requirement of § 111 is merely a formal requirement, lacking in substance, as New York courts find consent to be unnecessary whenever the best interests of the child support the adoption. Because the best interests of the child always determine whether an adoption petition is granted in New York, appellees contend that all parents, including unwed fathers, are subject to the same standard.

Appellees' interpretation of § 111 finds no support in New York case law. On the contrary, the New York Court of Appeals has stated unequivocally that the question whether consent is required is entirely separate from that of the best interests of the child.[5] Indeed, the Surrogate's decision in the present case, affirmed by the New York Court of Appeals, was

---

may require that notice be given to the natural parents in such manner as he may prescribe."

[5] See *In re Corey L.* v. *Martin L.*, 45 N. Y. 2d 383, 391, 380 N. E. 2d 266, 270 (1978):

"Absent consent, the first focus here was on the issue of abandonment since neither decisional rule nor statute can bring the relationship to an end because someone else might rear the child in a more satisfactory fashion . . . . Abandonment, as it pertains to adoption, relates to such conduct on the part of a parent as evinces a purposeful ridding of parental obligations and the foregoing of parental rights—a withholding of interest, presence, affection, care and support. The best interests of the child, as such, is not an ingredient of that conduct and is not involved in this threshold question. While promotion of the best interests of the child is essential to ultimate approval of the adoption application, such interests cannot act as a substitute for a finding of abandonment." (Citations omitted.)

based upon the assumption that there was a distinctive difference between the rights of Abdiel Caban, as the unwed father of David and Denise, and Maria Mohammed, as the unwed mother of the children: Adoption by Abdiel was held to be impermissible in the absence of Maria's consent, whereas adoption by Maria could be prevented by Abdiel only if he could show that the Mohammeds' adoption of the children would not be in the children's best interests. Accordingly, it is clear that § 111 treats unmarried parents differently according to their sex.[6]

## III

Gender-based distinctions "must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to withstand judicial scrutiny under the Equal Protection Clause. *Craig* v. *Boren,* 429 U. S. 190, 197 (1976). See also *Reed* v. *Reed,* 404 U. S. 71 (1971). The question before us, therefore, is whether the distinction in § 111 between unmarried mothers and unmarried fathers bears a substantial relation to some important state interest. Appellees assert that the distinction is justified by a fundamental difference between maternal and paternal relations—that "a natural mother, absent special circumstances, bears a closer relationship with her child . . . than a father does." Tr. of Oral Arg. 41.

---

[6] The dissents speculate that the sex-based distinction of § 111 might not apply to those unwed fathers who obtain legal custody of their children. See *post,* at 395, and at 412–413, n. 23. But no New York court has so ruled. Indeed, one court has indicated that, at least with respect to legitimate children, the provision in § 111 (4) giving legal guardians a veto over the adoption of their wards applies only if the natural parents are dead. See *In re Mendelsohn's Adoption,* 180 Misc. 147, 149, 39 N. Y. S. 2d 384, 386 (Surr. Ct. 1943). We should not overlook, therefore, the New York courts' exclusive reliance upon § 111 (3) and instead speculate whether, if Caban had sought and obtained legal custody of his children, his legal rights would have been different under New York law.

Contrary to appellees' argument and to the apparent presumption underlying § 111, maternal and paternal roles are not invariably different in importance. Even if unwed mothers as a class were closer than unwed fathers to their newborn infants, this generalization concerning parent-child relations would become less acceptable as a basis for legislative distinctions as the age of the child increased. The present case demonstrates that an unwed father may have a relationship with his children fully comparable to that of the mother. Appellant Caban, appellee Maria Mohammed, and their two children lived together as a natural family for several years. As members of this family, both mother and father participated in the care and support of their children.[7] There is no reason to believe that the Caban children—aged 4 and 6 at the time of the adoption proceedings—had a relationship with their mother unrivaled by the affection and concern of their father. We reject, therefore, the claim that the broad, gender-based distinction of § 111 is required by any universal difference between maternal and paternal relations at every phase of a child's development.

As an alternative justification for § 111, appellees argue that the distinction between unwed fathers and unwed mothers is substantially related to the State's interest in promoting the adoption of illegitimate children. Although the legislative

---

[7] In rejecting an unmarried father's constitutional claim in *Quilloin* v. *Walcott*, 434 U. S. 246 (1978), we emphasized the importance of the appellant's failure to act as a father toward his children, noting that he "has never exercised actual or legal custody over his child, and thus has never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child. Appellant does not complain of his exemption from these responsibilities and, indeed, he does not even now seek custody of his child." *Id.*, at 256.

In *Quilloin* we expressly reserved the question whether the Georgia statute similar to § 111 of the New York Domestic Relations Law unconstitutionally distinguished unwed parents according to their gender, as the claim was not properly presented. See 434 U. S., at 253 n. 13.

history of § 111 is sparse,[8] in *In re Malpica-Orsini*, 36 N. Y. 2d 568, 331 N. E. 2d 486 (1975), the New York Court of Appeals identified as the legislature's purpose in enacting § 111 the furthering of the interests of illegitimate children, for whom adoption often is the best course.[9] The court concluded:

> "To require the consent of fathers of children born out of wedlock . . . , or even some of them, would have the overall effect of denying homes to the homeless and of depriving innocent children of the other blessings of adoption. The cruel and undeserved out-of-wedlock stigma would continue its visitations. At the very least, the worthy process of adoption would be severely impeded." 36 N. Y. 2d, at 572, 331 N. E. 2d, at 489.

The court reasoned that people wishing to adopt a child born out of wedlock would be discouraged if the natural father could prevent the adoption by the mere withholding of his consent. Indeed, the court went so far as to suggest that "[m]arriages would be discouraged because of the reluctance of prospective husbands to involve themselves in a family sit-

---

[8] Consent of the unmarried father has never been required for adoption under New York law, although parental consent otherwise has been required at least since the late 19th century. See, *e. g.*, 1896 N. Y. Laws, ch. 272. There are no legislative reports setting forth the reasons why the New York Legislature excepted unmarried fathers from the general requirement of parental consent for adoption.

[9] In *Orsini v. Blasi*, 423 U. S. 1042 (1976), the Court dismissed an appeal from the New York Court of Appeals challenging the constitutionality of § 111 as applied to an unmarried father whose child had been ordered adopted by a New York Family Court. In dismissing the appeal, we indicated that a substantial federal question was lacking. This was a ruling on the merits, and therefore is entitled to precedential weight. See *Hicks v. Miranda*, 422 U. S. 332, 344 (1975). At the same time, however, our decision not to review fully the questions presented in *Orsini v. Blasi* is not entitled to the same deference given a ruling after briefing, argument, and a written opinion. See *Edelman v. Jordan*, 415 U. S. 651, 671 (1974). Insofar as our decision today is inconsistent with our dismissal in *Orsini*, we overrule our prior decision.

uation where they might only be a foster parent and could not adopt the mother's offspring." *Id.*, at 573, 331 N. E. 2d, at 490. Finally, the court noted that if unwed fathers' consent were required before adoption could take place, in many instances the adoption would have to be delayed or eliminated altogether, because of the unavailability of the natural father.[10]

The State's interest in providing for the well-being of illegitimate children is an important one. We do not question that the best interests of such children often may require their adoption into new families who will give them the stability of a normal, two-parent home. Moreover, adoption will remove the stigma under which illegitimate children suffer. But the unquestioned right of the State to further these desirable ends by legislation is not in itself sufficient to justify the gender-based distinction of § 111. Rather, under the relevant cases applying the Equal Protection Clause it must be shown that the distinction is structured reasonably to further these ends. As we repeated in *Reed* v. *Reed*, 404 U. S., at 76, such a statutory "classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co.* v. *Virginia*, 253 U. S. 412, 415 (1920)."

We find that the distinction in § 111 between unmarried mothers and unmarried fathers, as illustrated by this case, does not bear a substantial relation to the State's interest in providing adoptive homes for its illegitimate children. It may be that, given the opportunity, some unwed fathers would prevent the adoption of their illegitimate children. This impediment to adoption usually is the result of a natural

---

[10] In his brief as *amicus curiae,* the New York Attorney General echoes the New York Court of Appeals' exposition in *In re Malpica-Orsini* of the interests promoted by § 111's different treatment of unmarried fathers. See Brief for New York Attorney General as *Amicus Curiae* 16–20.

parental interest shared by both genders alike; it is not a manifestation of any profound difference between the affection and concern of mothers and fathers for their children. Neither the State nor the appellees have argued that unwed fathers are more likely to object to the adoption of their children than are unwed mothers; nor is there any self-evident reason why as a class they would be.

The New York Court of Appeals in *In re Malpica-Orsini, supra,* suggested that the requiring of unmarried fathers' consent for adoption would pose a strong impediment for adoption because often it is impossible to locate unwed fathers when adoption proceedings are brought, whereas mothers are more likely to remain with their children. Even if the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and fathers of newborns,[11] these difficulties need not persist past infancy. When the adoption of an older child is sought, the State's interest in proceeding with adoption cases can be protected by means that do not draw such an inflexible gender-based distinction as that made in § 111.[12] In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child. Indeed, under the statute as it now stands the surrogate may proceed in the absence of consent when the parent whose consent otherwise would be required never has come forward or has abandoned the child.[13] See, *e. g., In re Orlando F.,* 40 N. Y. 2d 103, 351

---

[11] Because the question is not before us, we express no view whether such difficulties would justify a statute addressed particularly to newborn adoptions, setting forth more stringent requirements concerning the acknowledgment of paternity or a stricter definition of abandonment.

[12] See Comment, The Emerging Constitutional Protection of the Putative Father's Parental Rights, 70 Mich. L. Rev. 1581, 1590 (1972).

[13] If the New York Court of Appeals is correct that unmarried fathers often desert their families (a view we need not question), then allowing

N. E. 2d 711 (1976). But in cases such as this, where the father has established a substantial relationship with the child and has admitted his paternity,[14] a State should have no difficulty in identifying the father even of children born out of wedlock.[15] Thus, no showing has been made that the different treatment afforded unmarried fathers and unmarried mothers under § 111 bears a substantial relationship to the proclaimed interest of the State in promoting the adoption of illegitimate children.

those fathers who remain with their families a right to object to the termination of their parental rights will pose little threat to the State's ability to order adoption in most cases. For we do not question a State's right to do what New York has done in this portion of § 111: provide that fathers who have abandoned their children have no right to block adoption of those children.

We do not suggest, of course, that the provision of § 111 making parental consent unnecessary in cases of abandonment is the only constitutional mechanism available to New York for the protection of its interest in allowing the adoption of illegitimate children when their natural fathers are not available to be consulted. In reviewing the constitutionality of statutory classifications, "it is not the function of a court 'to hypothesize independently on the desirability or feasibility of any possible alternative[s]' to the statutory scheme formulated by [the State]." *Lalli* v. *Lalli,* 439 U. S. 259, 274 (1978) (quoting *Mathews* v. *Lucas,* 427 U. S. 495, 515 (1976)). We note some alternatives to the gender-based distinction of § 111 only to emphasize that the state interests asserted in support of the statutory classification could be protected through numerous other mechanisms more closely attuned to those interests.

[14] In *Quilloin* v. *Walcott,* 434 U. S. 246 (1978), we noted the importance in cases of this kind of the relationship that in fact exists between the parent and child. See n. 7, *supra.*

[15] States have a legitimate interest, of course, in providing that an unmarried father's right to object to the adoption of a child will be conditioned upon his showing that it is in fact his child. Cf. *Lalli* v. *Lalli, supra,* at 268–269. Such is not, however, the import of the New York statute here. Although New York provides for actions in its Family Courts to establish paternity, see N. Y. Family Court Act §§ 511 to 571 (McKinney 1975 and Supp. 1978–1979), there is no provision allowing men who have been determined by the court to be the father of a child born out of wedlock to object to the adoption of their children under § 111.

In sum, we believe that § 111 is another example of "overbroad generalizations" in gender-based classifications. See *Califano* v. *Goldfarb*, 430 U. S. 199, 211 (1977); *Stanton* v. *Stanton*, 421 U. S. 7, 14–15. (1975). The effect of New York's classification is to discriminate against unwed fathers even when their identity is known and they have manifested a significant paternal interest in the child. The facts of this case illustrate the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children. Section 111 both excludes some loving fathers from full participation in the decision whether their children will be adopted and, at the same time, enables some alienated mothers arbitrarily to cut off the paternal rights of fathers. We conclude that this undifferentiated distinction between unwed mothers and unwed fathers, applicable in all circumstances where adoption of a child of theirs is at issue, does not bear a substantial relationship to the State's asserted interests.[16]

The judgment of the New York Court of Appeals is

*Reversed.*

Mr. Justice Stewart, dissenting.

For reasons similar to those expressed in the dissenting opinion of Mr. Justice Stevens, I agree that § 111 (1)(c) of

---

[16] Appellant also challenges the constitutionality of the distinction made in § 111 between married and unmarried fathers. As we have resolved that the sex-based distinction of § 111 violates the Equal Protection Clause, we need express no view as to the validity of this additional classification.

Finally, appellant argues that he was denied substantive due process when the New York courts terminated his parental rights without first finding him to be unfit to be a parent. See *Stanley* v. *Illinois*, 405 U. S. 645 (1972) (semble). Because we have ruled that the New York statute is unconstitutional under the Equal Protection Clause, we similarly express no view as to whether a State is constitutionally barred from ordering adoption in the absence of a determination that the parent whose rights are being terminated is unfit.

the New York Domestic Relations Law (McKinney 1977) is not constitutionally infirm. The State's interest in promoting the welfare of illegitimate children is of far greater importance than the opinion of the Court would suggest. Unlike the children of married parents, illegitimate children begin life with formidable handicaps. They typically depend upon the care and economic support of only one parent—usually the mother. And, even in this era of changing mores, they still may face substantial obstacles simply because they are illegitimate. Adoption provides perhaps the most generally available way of removing these handicaps. See H. Clark, Law of Domestic Relations 177 (1968). Most significantly, it provides a means by which an illegitimate child can become legitimate—a fact that the Court's opinion today barely acknowledges.

The New York statute reflects the judgment that, to facilitate this ameliorative change in the child's status, the consent of only one parent should ordinarily be required for adoption of a child born out of wedlock. The mother has been chosen as the parent whose consent is indispensable. A different choice would defy common sense. But the unwed father, if he is the lawful custodian of the child, must under the statute also consent.* And, even when he does not have custody, the unwed father who has an established relationship with his illegitimate child is not denied the opportunity to participate in the adoption proceeding. His relationship with the child will be terminated through adoption only if a court determines that adoption will serve the child's best interest. These distinctions represent, I think, a careful accommodation of the competing interests at stake and bear a close and substantial relationship to the State's goal of promoting the welfare of its children. In my view, the Constitution requires no more.

The appellant has argued that the statute, in granting

---

*New York Dom. Rel. Law § 111 (1) (d) (McKinney 1977) requires the consent of "any person or authorized agency having lawful custody of the adoptive child."

rights to an unwed mother that it does not grant to an unwed father, violates the Equal Protection Clause by discriminating on the basis of gender. And he also has made the argument that the statute, because it withholds from the unwed father substantive rights granted to all other classes of parents, violates both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment. I find the latter contention less troublesome than does my Brother STEVENS, and see no ultimate merit in the former.

## A

The appellant relies primarily on *Stanley* v. *Illinois,* 405 U. S. 645, in advancing the second argument identified above. But it is obvious that the principle established in that case is not offended by the New York law. The Illinois statute invalidated in *Stanley* employed a stark and absolute presumption that the unwed father was not a fit parent. Upon the death of the unwed mother, the children were declared wards of the State and in Stanley's case were removed from his custody without any hearing or demonstration that he was not a fit parent. Custody having been taken from the father by a stranger—the State—the children were then transferred to other strangers. Stanley, who had lived with his three children over a period of 18 years, was given no opportunity to object. And, although the statute purported to promote the welfare of illegitimate children, the State's termination of Stanley's family relationship was made without any finding that the interests of his children would thereby be served.

Here, in sharp contrast, the unwed mother is alive, has married, and has voluntarily initiated the adoption proceeding. The appellant has been given the opportunity to participate and to present evidence on the question whether adoption would be in the best interests of the children. Thus, New York has accorded to the appellant all the process that Illinois unconstitutionally denied to Stanley.

The Constitution does not require that an unmarried father's substantive parental rights must always be coextensive with those afforded to the fathers of legitimate children. In this setting, it is plain that the absence of a legal tie with the mother provides a constitutionally valid ground for distinction. The decision to withhold from the unwed father the power to veto an adoption by the natural mother and her husband may well reflect a judgment that the putative father should not be able arbitrarily to withhold the benefit of legitimacy from his children.

Even if it be assumed that each married parent after divorce has some substantive due process right to maintain his or her parental relationship, cf. *Smith* v. *Organization of Foster Families,* 431 U. S. 816, 862–863 (opinion concurring in judgment), it by no means follows that each unwed parent has any such right. Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring. The mother carries and bears the child, and in this sense her parental relationship is clear. The validity of the father's parental claims must be gauged by other measures. By tradition, the primary measure has been the legitimate familial relationship he creates with the child by marriage with the mother. By definition, the question before us can arise only when no such marriage has taken place. In some circumstances the actual relationship between father and child may suffice to create in the unwed father parental interests comparable to those of the married father. Cf. *Stanley* v. *Illinois, supra.* But here we are concerned with the rights the unwed father may have when his wishes and those of the mother are in conflict, and the child's best interests are served by a resolution in favor of the mother. It seems to me that the absence of a legal tie with the mother may in such circumstances appropriately place a limit on whatever substantive constitutional claims might otherwise exist by virtue of the father's actual relationship with the children.

## B

The appellant's equal protection challenge to the distinction drawn between the unwed father and mother seems to me more substantial. Gender, like race, is a highly visible and immutable characteristic that has historically been the touchstone for pervasive but often subtle discrimination. Although the analogy to race is not perfect and the constitutional inquiry therefore somewhat different, gender-based statutory classifications deserve careful constitutional examination because they may reflect or operate to perpetuate mythical or stereotyped assumptions about the proper roles and the relative capabilities of men and women that are unrelated to any inherent differences between the sexes. Cf. *Orr* v. *Orr,* 440 U. S. 268. Sex-based classifications are in many settings invidious because they relegate a person to the place set aside for the group on the basis of an attribute that the person cannot change. *Reed* v. *Reed,* 404 U. S. 71; *Stanton* v. *Stanton,* 421 U. S. 7; *Frontiero* v. *Richardson,* 411 U. S. 677; *Weinberger* v. *Wiesenfeld,* 420 U. S. 636; *Orr* v. *Orr, supra.* Such laws cannot be defended, as can the bulk of the classifications that fill the statute books, simply on the ground that the generalizations they reflect may be true of the majority of members of the class, for a gender-based classification need not ring false to work a discrimination that in the individual case might be invidious. Nonetheless, gender-based classifications are not invariably invalid. When men and women are not in fact similarly situated in the area covered by the legislation in question, the Equal Protection Clause is not violated. See, *e. g., Schlesinger* v. *Ballard,* 419 U. S. 498. Cf. *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 59 (concurring opinion).

In my view, the gender-based distinction drawn by New York falls in this latter category. With respect to a large group of adoptions—those of newborn children and infants— unwed mothers and unwed fathers are simply not similarly

situated, as my Brother STEVENS has demonstrated. Our law has given the unwed mother the custody of her illegitimate children precisely because it is she who bears the child and because the vast majority of unwed fathers have been unknown, unavailable, or simply uninterested. See H. Clark, Law of Domestic Relations 176–177 (1968); H. Krause, Illegitimacy: Law and Social Policy 29–32 (1971). This custodial preference has carried with it a correlative power in the mother to place her child for adoption or not to do so.

The majority of the States have incorporated these basic common-law rules in their statutes identifying the persons whose participation or consent is requisite to a valid adoption. See generally Note, 59 Va. L. Rev. 517 (1973); Comment, 70 Mich. L. Rev. 1581 (1972). These common-law and statutory rules of law reflect the physical reality that only the mother carries and gives birth to the child, as well as the undeniable social reality that the unwed mother is always an identifiable parent and the custodian of the child—until or unless the State intervenes. The biological father, unless he has established a familial tie with the child by marrying the mother, is often a total stranger from the State's point of view. I do not understand the Court to question these pragmatic differences. See *ante,* at 392. An unwed father who has not come forward and who has established no relationship with the child is plainly not in a situation similar to the mother's. New York's consent distinctions have clearly been made on this basis, and in my view they do not violate the Equal Protection Clause of the Fourteenth Amendment. See *Schlesinger* v. *Ballard, supra.*

In this case, of course, we are concerned not with an unwilling or unidentified father but instead with an unwed father who has established a paternal relationship with his children. He is thus similarly situated to the mother, and his claim is that he thus has parental interests no less deserving of protection than those of the mother. His contention that the New York

law in question consequently discriminates against him on the basis of gender cannot be lightly dismissed. For substantially the reasons expressed by MR. JUSTICE STEVENS in his dissenting opinion, *post,* at 412–413, I believe, however, that this gender-based distinction does not violate the Equal Protection Clause as applied in the circumstances of the present case.

It must be remembered that here there are not two, but three interests at stake: the mother's, the father's, and the children's. Concerns humane as well as practical abundantly support New York's provision that only one parent need consent to the adoption of an illegitimate child, though it requires both parents to consent to the adoption of one already legitimate. If the consent of both unwed parents were required, and one withheld that consent, the illegitimate child would remain illegitimate. Viewed in these terms the statute does not in any sense discriminate on the basis of sex. The question, then, is whether the decision to select the unwed mother as the parent entitled to give or withhold consent and to apply that rule even when the unwed father in fact has a paternal relationship with his children constitutes invidious sex-based discrimination.

The appellant's argument would be a powerful one were this an instance in which it had been found that adoption by the father would serve the best interests of the children, and in the face of that finding the mother had been permitted to block the adoption. But this is not such a case. As my Brother STEVENS has observed, under a sex-neutral rule—assuming that New York is free to require the consent of but one parent for the adoption of an illegitimate child—the outcome in this case would have been the same. The appellant has been given the opportunity to show that an adoption would not be in his children's best interests. Implicit in the finding made by the New York courts is the judgment that termination of his relationship with the children will in fact promote their well-being—a judgment we are obligated to accept.

That the statute might permit—in a different context—the unwed mother arbitrarily to thwart the wishes of the caring father as well as the best interests of the child is not a sufficient reason to invalidate it as applied in the present case. For here the legislative goal of the statute—to facilitate adoptions that are in the best interests of illegitimate children after consideration of all other interests involved—has indeed been fully and fairly served by this gender-based classification. Unless the decision to require the consent of only one parent is in itself constitutionally defective, which nobody has argued, the same interests that support that decision are sufficiently profound to overcome the appellant's claim that he has been invidiously discriminated against because he is a male.

I agree that retroactive application of the Court's decision today would work untold harm, and I fully subscribe to Part III of MR. JUSTICE STEVENS' dissent.

MR. JUSTICE STEVENS, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Under § 111 (1)(c) of the New York Domestic Relations Law (McKinney 1977), the adoption of a child born out of wedlock usually requires the consent of the natural mother; it does not require that of the natural father unless he has "lawful custody." See *ante*, at 386 n. 4. Appellant, the natural but noncustodial father of two school-age children born out of wedlock,[1] challenges that provision insofar as it allows the adoption of his natural children by the husband of the natural mother without his consent. Appellant's primary objection is that this unconsented-to termination of his parental rights without proof of unfitness on his part violates the substantive component of the Due Process Clause of the Fourteenth Amendment. Secondarily, he attacks § 111 (1)(c)'s dis-

---

[1] The children are presently 8 and 9 years old. At the time of the hearing before the Surrogate Court, they were 5 and 6.

parate treatment of natural mothers and natural fathers as a violation of the Equal Protection Clause of the same Amendment. In view of the Court's disposition, I shall discuss the equal protection question before commenting on appellant's primary contention. I shall then indicate why I think the holding of the Court, although erroneous, is of limited effect.

## I

This case concerns the validity of rules affecting the status of the thousands of children who are born out of wedlock every day.[2] All of these children have an interest in acquiring the status of legitimacy; a great many of them have an interest in being adopted by parents who can give them opportunities that would otherwise be denied; for some the basic necessities of life are at stake. The state interest in facilitating adoption in appropriate cases is strong—perhaps even "compelling."[3]

---

[2] Illegitimate births accounted for an estimated 14.7% and 15.5% of all births in the United States during the years 1976 and 1977, respectively. See U. S. Dept. of HEW, National Center for Health Statistics, 27 Vital Statistics Report, No. 11, p. 19 (1979); 26 Vital Statistics Report, No. 12, p. 17 (1978). In total births, this represents 468,100 and 515,700 illegitimate births, respectively. Although statistics for New York State are not available, the problem of illegitimacy appears to be especially severe in urban areas. For example, in 1975, over 50% of all births in the District of Columbia were out of wedlock. U. S. Dept. of HEW, National Center for Health Statistics, 1 Vital Statistics of the United States, 1975 (Natality), 50 (1978).

Adoption is an important solution to the problem of illegitimacy. Thus, about 70% of the adoptions in the 34 States reporting to HEW in 1975 were of children born out of wedlock. The figure for New York State was 78%. U. S. Dept. of HEW, National Center for Social Statistics, Adoptions in 1975, p. 11 (1977) (hereinafter Adoptions in 1975).

[3] The reason I say "perhaps" is that the word "compelling" can be understood in different ways. If it describes an interest that "compels" a conclusion that any statute intended to foster that interest is automatically constitutional, few if any interests would fit that description. On the other hand, if it merely describes an interest that compels a court,

Nevertheless, it is also true that § 111 (1)(c) gives rights to natural mothers that it withholds from natural fathers. Because it draws this gender-based [4] distinction between two classes of citizens who have an equal right to fair and impartial treatment by their government, it is necessary to determine whether there are differences between the members of the two classes that provide a justification for treating them differently.[5] That determination requires more than merely recognizing that society has traditionally treated the two classes differently.[6] But it also requires analysis that goes beyond a merely reflexive rejection of gender-based distinctions.

before holding a law unconstitutional, to give thoughtful attention to a legislative judgment that the law will serve that interest, then the State's interest in facilitating adoption in appropriate cases is unquestionably compelling. See *Smith* v. *Organization of Foster Families*, 431 U. S. 816, 844, and n. 51; *id.*, at 861–862 (STEWART, J., concurring in judgment); *Weber* v. *Aetna Casualty & Surety Co.*, 406 U. S. 164, 175; *Stanley* v. *Illinois*, 405 U. S. 645, 652; *In re Malpica-Orsini*, 36 N. Y. 2d 568, 571–574, 331 N. E. 2d 486, 488–491 (1975).

[4] Although not all men are included in the disadvantaged class, since under § 111 (1)(b) *married* fathers are given consent rights, it is nonetheless true that but for their gender the members of that class would not be disadvantaged. Hence, it is not possible to avoid the conclusion that the classification here is one based on gender. See *Los Angeles Dept. of Water & Power* v. *Manhart*, 435 U. S. 702, 711.

[5] Section 111 treats illegitimate children somewhat differently from legitimate ones insofar as the former, but not the latter, may be removed from one or both of their natural parents and placed in an adoptive home without the consent of *both* parents. Nonetheless, appellant has not challenged the statute on this basis either on his or his children's behalf, and the difficult questions that might be raised by such a challenge, compare *Lalli* v. *Lalli*, 439 U. S. 259, with *Trimble* v. *Gordon*, 430 U. S. 762, are not now before us.

[6] "For a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification. Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white. But that sort of stereotyped reaction

Men and women are different, and the difference is relevant to the question whether the mother may be given the exclusive right to consent to the adoption of a child born out of wedlock. Because most adoptions involve newborn infants or very young children,[7] it is appropriate at the outset to focus on the significance of the difference in such cases.

Both parents are equally responsible for the conception of the child out of wedlock.[8] But from that point on through pregnancy and infancy, the differences between the male and the female have an important impact on the child's destiny. Only the mother carries the child; it is she who has the constitutional right to decide whether to bear it or not.[9] In many

---

may have no rational relationship—other than pure prejudicial discrimination—to the stated purpose for which the classification is being made." *Mathews* v. *Lucas,* 427 U. S. 495, 520–521 (STEVENS, J., dissenting).

[7] The relevant statistics for New York are not complete. The most comprehensive ones that we have found are for the years 1974 and 1975. Even for those years, however, we could find none that include a breakdown by age of the adoptive children where one of the adoptive parents is in some way related to the child. (New York adoptions by related parents—including ones by relatives other than a natural parent and stepparent—accounted for just over half of all adoptions in 1974 and just under half in 1975.) Nonetheless, of the children adopted by unrelated parents in New York in 1974 and 1975, respectively, 66% and 62% were under 1 year old, and 90% and 88% were under 6 years old. In 1974, moreover, the median age of the child at the time of adoption was 5 months; no similar figure is available for 1975. New York's figures appear to be fairly close to those obtaining nationally. U. S. Dept. of HEW, National Center for Statistics, Adoptions in 1974, pp. 15–16 (1976); Adoptions in 1975, p. 15.

[8] Of course, this is not true in every individual case, or perhaps in most cases. Nevertheless, for purposes of equal protection analysis, it probably should be assumed that in the class of cases in which the parties are not equally responsible, the woman has been the aggressor about as often as the man. If this assumption is doubted on the ground that the adverse consequences of conception out of wedlock typically make the woman more cautious because those consequences are more serious for her, that doubt merely reinforces the basic analysis set forth in the text.

[9] See *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 67–75.

cases, only the mother knows who sired the child, and it will often be within her power to withhold that fact, and even the fact of her pregnancy, from that person. If during pregnancy the mother should marry a different partner, the child will be legitimate when born, and the natural father may never even know that his "rights" have been affected. On the other hand, only if the natural mother agrees to marry the natural father during that period can the latter's actions have a positive impact on the status of the child; if he instead should marry a different partner during that time, the only effect on the child is negative, for the likelihood of legitimacy will be lessened.

These differences continue at birth and immediately thereafter. During that period, the mother and child are together; [10] the mother's identity is known with certainty. The father, on the other hand, may or may not be present; his identity may be unknown to the world and may even be uncertain to the mother.[11] These natural differences between unmarried fathers and mothers make it probable that the mother, and not the father or both parents, will have custody of the newborn infant.[12]

---

[10] In fact, there is some sociological and anthropological research indicating that by virtue of the symbiotic relationship between mother and child during pregnancy and the initial contact between mother and child directly after birth a physical and psychological bond immediately develops between the two that is not then present between the infant and the father or any other person. E. g., 1 & 2 J. Bowlby, Attachment and Loss (1969, 1973); M. Mahler, The Psychological Birth of the Human Infant (1975).

[11] The Court has frequently noted the difficulty of proving paternity in cases involving illegitimate children. E. g., Trimble v. Gordon, supra, at 770–771; Gomez v. Perez, 409 U. S. 535, 538. Indeed, these proof problems have been relied upon to justify differential treatment not only of unwed mothers and fathers but also of legitimate and illegitimate children. Parham v. Hughes, ante, at 357–358 (plurality opinion); Lalli v. Lalli, supra, at 268–269 (plurality opinion).

[12] Although statistics are hard to find in this area, those I have found bear out the proposition that is developed in text as a logical matter. Thus, in "relinquishment adoptions" in California in 1975, natural moth-

In short, it is virtually inevitable that from conception through infancy the mother will constantly be faced with decisions about how best to care for the child, whereas it is much less certain that the father will be confronted with comparable problems. There no doubt are cases in which the relationship of the parties at birth makes it appropriate for the State to give the father a voice of some sort in the adoption decision.[13]  But as a matter of equal protection analysis,

ers signed the "relinquishment" documents—papers that release custody of the child to an adoption agency and that must be signed by the parent(s) with custody, or by a judge in cases involving neglect or abandonment by the parent(s) who previously had custody—in 69% of the cases, while natural fathers did so in only 36% of the cases. On the other hand, fathers took *no* part in over 28% of the relinquishment adoptions, apparently because they never had custody, while the comparable figure for mothers was 3.5%. California Health and Welfare Agency, Characteristics of Relinquishment Adoptions in California, 1970–1975, Tables 11 and 12 (1978).

[13] Cf. Part II, *infra*. Indeed, New York does give unwed fathers ample opportunity to participate in adoption proceedings. In this case, for example, appellant appeared at the adoption hearing with counsel, presented testimony, and was allowed to cross-examine the witnesses offered by appellees. See N. Y. Dom. Rel. Law § 111-a (McKinney 1977 and Supp. 1978–1979); App. 27; *ante,* at 383. As a substantive matter, the natural father is free to demonstrate, as appellant unsuccessfully tried to do in this case, that the best interests of the child favor the preservation of existing parental rights and forestall cutting off those rights by way of adoption. Had appellant been able to make that demonstration, the result would have been the same as that mandated by the Court's insistence upon paternal as well as maternal consent in these circumstances: neither parent could adopt the child into a new family with a stepparent; both would have parental rights (*e. g.,* visitation); and custody would be determined by the child's best interests.

In this case, although the New York courts made no finding of unfitness on appellant's part, there was ample evidence in the record from which they could draw the conclusion that his relationship with the children had been somewhat intermittent, that it fell far short of the relationship existing between the mother and the children (whether measured by the amount of time spent with the children, the responsibility taken

it is perfectly obvious that at the time and immediately after a child is born out of wedlock, differences between men and women justify some differential treatment of the mother and father in the adoption process.

Most particularly, these differences justify a rule that gives the mother of the newborn infant the exclusive right to consent to its adoption. Such a rule gives the mother, in whose sole charge the infant is often placed anyway, the maximum flexibility in deciding how best to care for the child. It also gives the loving father an incentive to marry the mother,[14] and has no adverse impact on the disinterested father. Finally, it facilitates the interests of the adoptive parents, the child, and the public at large by streamlining the often traumatic adoption process and allowing the prompt, complete, and reliable integration of the child into a satisfac-

for their care and education, or the amount of resources expended on them), and that judging from appellant's treatment of his first wife and his children by that marriage, there was a real possibility that he could not be counted on for the continued support of the two children and might well be a source of friction between them, the mother, and her new husband. *E. g.*, App. 22, 25; Tr. 4–7, 12–20, 36, 50, 70 (Mar. 19, 1976); Tr. 130–135, 156–157, 162–163 (Apr. 30, 1976).

That conclusion, coupled with the Surrogate's finding that the mother's marriage to the adoptive father was "solid and permanent" and that the children were "well cared for and healthy" in the new family, App. 30, surely justifies the Surrogate's ultimate conclusion that the legitimacy and stability to be gained by the children from the adoption far outweighed their loss (and even appellant's) due to the termination of appellant's parental rights. See *id.*, at 28:

"Whatever the motive for [appellant's] opposition to the adoption, the consequences are the same—harassment of the natural mother in her new relationship and embarrassment to [the children] who though living with and being supported in the new family may not in school and elsewhere bear the family name."

[14] Marrying the mother would not only legitimate the child but would also assure the father the right to consent to any adoption. See N. Y. Dom. Rel. Law § 111 (1)(b) (McKinney 1977).

tory new home at as young an age as is feasible.[15]   Put most simply, it permits the maximum participation of interested natural parents without so burdening the adoption process that its attractiveness to potential adoptive parents is destroyed.

This conclusion is borne out by considering the alternative rule proposed by appellant.   If the State were to require the consent of both parents, or some kind of hearing to explain why either's consent is unnecessary or unobtainable,[16] it would unquestionably complicate and delay the adoption process. Most importantly, such a rule would remove the mother's freedom of choice in her own and the child's behalf without also relieving her of the unshakable responsibility for the care of the child.   Furthermore, questions relating to the adequacy of notice to absent fathers could invade the mother's privacy,[17] cause the adopting parents to doubt the reliability

---

[15] These are not idle interests.   A survey of adoptive parents registered on the New York State Adoption Exchange as of January 1975 showed that over 75% preferred to adopt children under 3 years old; over half preferred children under 1 year old.   New York Department of Social Services, Adoption in New York State 20 (Program Analysis Report No. 59, July 1975).   Moreover, adoption proceedings, even when judicial in nature, have traditionally been expeditious in order to accommodate the needs of all concerned.   Thus, 61% of all Family Court adoption proceedings in New York during the fiscal year 1972–1973 were disposed of within 90 days.   Nineteenth Annual Report of the Judicial Conference to the Governor of the State of New York and the Legislature 352 (Legislative Doc. No. 90, 1974).

[16] Although the Court is careful to leave the States free to develop alternative approaches, it nonetheless endorses the procedure described in text for adoptions of older children against the wishes of natural fathers who have established substantial relationships with the children. *Ante*, at 392–393, and 393 n. 13.

[17] To be effective, any such notice would probably have to name the mother and perhaps even identify her further, for example, by address. Moreover, the terms and placement of the notice in, for example, a newspaper, no matter how discreet and tastefully chosen, would inevitably be taken by the public as an announcement of illegitimate maternity.   To avoid the embarrassment of such announcements, the mother might well

of the new relationship, and add to the expense and time required to conclude what is now usually a simple and certain process.[18] While it might not be irrational for a State to conclude that these costs should be incurred to protect the interest of natural fathers, it is nevertheless plain that those costs, which are largely the result of differences between the mother and the father, establish an imposing justification for *some* differential treatment of the two sexes in this type of situation.

With this much the Court does not disagree; it confines its holding to cases such as the one at hand involving the adoption of an *older* child against the wishes of a natural father who previously has participated in the rearing of the child and who admits paternity. *Ante,* at 392–393. The Court does conclude, however, that the gender basis for the classification drawn by § 111 (1) (c) makes differential treatment so suspect that the State has the burden of showing not only that the rule is generally justified but also that the justification holds equally true for *all* persons disadvantaged by the rule. In its view, since the justification is not as strong for some indeterminately small part of the disadvantaged class as it is for the class as a whole, see *ante,* at 393, the rule is invalid under the Equal Protection Clause insofar as it applies to that subclass. With this conclusion I disagree.

If we assume, as we surely must, that characteristics possessed by all members of one class and by no members of the other class justify some disparate treatment of mothers and fathers of children born out of wedlock, the mere fact that the statute draws a "gender-based distinction," see *ante,* at 389,

---

be forced to identify the father (or potential fathers)—despite her desire to keep that fact a secret.

[18] In the opinion upon which it relied in dismissing the appeal in this case, the New York Court of Appeals concluded that the "trauma" that would be added to the adoption process by a paternal consent rule is "unpleasant to envision." *In re Malpica-Orsini,* 36 N. Y. 2d, at 574, 331 N. E. 2d, at 490. See n. 20, *infra.*

should not, in my opinion, give rise to any presumption that the impartiality principle embodied in the Equal Protection Clause has been violated.[19]  Indeed, if we make the further undisputed assumption that the discrimination is justified in those cases in which the rule has its most frequent application—cases involving newborn infants and very young children in the custody of their natural mothers, see nn. 7 and 12, *supra*—we should presume that the law is entirely valid and require the challenger to demonstrate that its unjust applications are sufficiently numerous and serious to render it invalid.

In this case, appellant made no such showing; his demonstration of unfairness, assuming he has made one, extends only to himself and by implication to the unknown number of fathers just like him.  Further, while appellant did nothing to inform the New York courts about the size of his subclass and the overall degree of its disadvantage under § 111 (1)(c), the New York Court of Appeals has previously concluded that the subclass is small and its disadvantage insignificant by comparison to the benefits of the rule as it now stands.[20]

[19] *E. g., Califano* v. *Webster,* 430 U. S. 313; *Schlesinger* v. *Ballard,* 419 U. S. 498.

[20] "To require the consent of fathers of children born out of wedlock . . . or even some of them, would have the overall effect of denying homes to the homeless and of depriving innocent children of the other blessings of adoption.  The cruel and undeserved out-of-wedlock stigma would continue its visitations.  At the very least, the worthy process of adoption would be severely impeded.

"Great difficulty and expense would be encountered, in many instances, in locating the putative father to ascertain his willingness to consent. Frequently, he is unlocatable or even unknown.  Paternity is denied more often than admitted.  Some birth certificates set forth the names of the reputed fathers, others do not.

"Couples considering adoptions will be dissuaded out of fear of subsequent annoyance and entanglements.  A 1961 study in Florida of 500 independent adoptions showed that 16% of the couples who had direct contact with the natural parents reported subsequent harassment, compared with only 2% of couples who had no contact (Isaac, Adopting a Child Today, pp 38, 116).  The burden on charitable agencies will be

The mere fact that an otherwise valid general classification appears arbitrary in an isolated case is not a sufficient reason

---

oppressive. In independent placements, the baby is usually placed in his adoptive home at four or five days of age, while the majority of agencies do not place children for several months after birth (p 88). Early private placements are made for a variety of reasons, such as a desire to decrease the trauma of separation and an attempt to conceal the out-of-wedlock birth. It is unlikely that the consent of the natural father could be obtained at such an early time after birth, and married couples, if well advised, would not accept a child, if the father's consent was a legal requisite and not then available. Institutions such as foundling homes which nurture the children for months could not afford to continue their maintenance, in itself not the most desirable, if fathers' consents are unobtainable and the wards therefore unplaceable. These philanthropic agencies would be reluctant to take infants for no one wants to bargain for trouble in an already tense situation. The drain on the public treasury would also be immeasurably greater in regard to infants placed in foster homes and institutions by public agencies.

"Some of the ugliest disclosures of our time involve black marketing of children for adoption. One need not be a clairvoyant to predict that the grant to unwed fathers of the right to veto adoptions will provide a very fertile field for extortion. The vast majority of instances where paternity has been established arise out of filiation proceedings, compulsory in nature, and persons experienced in the field indicate that these legal steps are instigated for the most part by public authorities, anxious to protect the public purse (see *Schaschlo v. Taishoff*, 2 N. Y. 2d 408, 411). While it may appear, at first blush, that a father might wish to free himself of the burden of support, there will be many who will interpret it as a chance for revenge or an opportunity to recoup their 'losses.'

"Marriages would be discouraged because of the reluctance of prospective husbands to involve themselves in a family situation where they might only be a foster parent and could not adopt the mother's offspring.

"We should be mindful of the jeopardy to which existing adoptions would be subjected and the resulting chaos by an unadulterated declaration of unconstitutionality. Even if there be a holding of nonretroactivity, the welfare of children, placed in homes months ago, or longer, and awaiting the institution or completion of legal proceedings, would be seriously affected. The attendant trauma is unpleasant to envision." *In re Malpica-Orsini, supra,* at 572–574, 331 N. E. 2d, at 488–490.

To the limited extent that the Court takes cognizance of these findings and conclusions, it does not dispute them. *Ante,* at 392, and 392–393,

for invalidating the entire rule.[21]   Nor, indeed, is it a sufficient reason for concluding that the application of a valid rule in a hard case constitutes a violation of equal protection principles.[22]   We cannot test the conformance of rules to the principle of equality simply by reference to exceptional cases.

Moreover, I am not at all sure that § 111 (1)(c) is arbitrary even if viewed solely in the light of the exceptional circumstances presently before the Court.   This case involves a dispute between natural parents over which of the two may adopt the children.   If both are given a veto, as the Court requires, neither may adopt and the children will remain illegitimate.   If, instead of a gender-based distinction, the veto were given to the parent having custody of the child, the mother would prevail just as she did in the state court.[23]

---

n. 13.   Instead, the Court merely states that many of these findings do not reflect appellant's situation and "need not" reflect the situation of any natural father who is seeking to prevent the adoption of his older children. *Ante,* at 392.

Although I agree that the findings of the New York Court of Appeals are more likely to be true of the strong majority of adoptions that involve infants than they are in the present situation (a conclusion that should be sufficient to justify the classification drawn by § 111 (1)(c) in *all* situations), I am compelled to point out that the Court marshals not one bit of evidence to bolster its empirical judgment that most natural fathers facing the adoption of their older children will have appellant's relatively exemplary record with respect to admitting paternity and establishing a relationship with his children.   In my mind, it is far more likely that what is true at infancy will be true thereafter—the mother will probably retain custody as well as the primary responsibility for the care and upbringing of the child.

[21] *Vance* v. *Bradley,* 440 U. S. 93, 108; *Califano* v. *Jobst,* 434 U. S. 47, 56–58; *Dandridge* v. *Williams,* 397 U. S. 471, 485.

[22] Even if the exclusive-consent requirement were limited to newborn infants, there would still be an occasional case in which the interests of the child would be better served by a responsible paternal veto than by an irresponsible maternal veto.

[23] In fact, although the Court understands it differently, the New York statute apparently *does* turn consent rights on custody.   Thus, § 111 (1) (d) (McKinney 1977) gives consent rights to "any person . . . having

Whether or not it is wise to devise a special rule to protect the natural father who (a) has a substantial relationship with his child, and (b) wants to veto an adoption that a court has found to be in the best interests of the child, the record in this case does not demonstrate that the Equal Protection Clause requires such a rule.

I have no way of knowing how often disputes between natural parents over adoption of their children arise after the father "has established a substantial relationship with the child and [is willing to admit] his paternity," *ante,* at 393, but has previously been unwilling to take steps to legitimate his relationship. I am inclined to believe that such cases are relatively rare. But whether or not this assumption is valid, the far surer assumption is that in the more common adoption situations, the mother will be the more, and often the only, responsible parent, and that a paternal consent requirement will constitute a hindrance to the adoption process. Because this general rule is amply justified in its normal application, I would therefore require the party challenging its constitutionality to make some demonstration of unfairness in a significant number of situations before concluding that it violates

---

lawful custody of the adoptive child." The New York courts have not had occasion to interpret this section in a situation in which a custodial father is seeking consent rights adverse to the wishes of the mother. Nonetheless, those courts have interpreted "legal custody" in a flexible and practical manner dependent on who actually is acting as the guardian of the child, *e. g., In re Erhardt,* 27 App. Div. 2d 836, 277 N. Y. S. 2d 734 (1967). Moreover, the Uniform Adoption Act, after which the New York statute appears to be patterned, has a similar section that its drafters intended to benefit "a father having custody of his illegitimate minor child." Uniform Adoption Act, § 5 (a) (3), Commissioners' Note, 9 U. L. A. 17 (1973). In this light, the allegedly improper impact of the gender-based classification in § 111 (1) (c) as challenged by appellant is even more attenuated than I have suggested because it only disqualifies those few natural fathers of older children who have established a substantial relationship with the child and have admitted paternity, but who nonetheless do not have custody of the children.

the Equal Protection Clause. That the Court has found a violation without requiring such a showing can only be attributed to its own "stereotyped reaction" to what is unquestionably, but in this case justifiably, a gender-based distinction.

## II

Although the substantive due process issue is more troublesome,[24] I can briefly state the reason why I reject it.

I assume that, if and when one develops,[25] the relationship between a father and his natural child is entitled to protection against arbitrary state action as a matter of due process. See *Stanley* v. *Illinois,* 405 U. S. 645, 651.[26] Although the Court has not decided whether the Due Process Clause provides any greater substantive protection for this relationship than simply against official caprice,[27] it has indicated that an adoption decree that terminates the relationship is constitutionally justified by a finding that the father has abandoned or mistreated the child. See *id.,* at 652. In my view, such a decree may also be justified by a finding that the adoption will serve

---

[24] Insofar as the New York statute allows natural fathers with actual custody of their illegitimate children to consent to the adoption of those children, see n. 23, *supra,* this issue is far less troublesome. Cf. *Stanley* v. *Illinois,* 405 U. S. 645.

[25] Cf. *Quilloin* v. *Walcott,* 434 U. S. 246. See also *Smith* v. *Organization of Foster Families,* 431 U. S., at 844.

[26] See also *id.,* at 842–847; *Armstrong* v. *Manzo,* 380 U. S. 545; *Meyer* v. *Nebraska,* 262 U. S. 390, 399–401.

[27] Although some Members of the Court have concluded that greater protection is due the "private realm of *family* life," *Prince* v. *Massachusetts,* 321 U. S. 158, 166 (emphasis added), *e. g., Moore* v. *East Cleveland,* 431 U. S. 494 (plurality opinion), this appeal does not fall within that realm because whatever family life once surrounded appellant, his children, and appellee Maria Mohammed has long since dissolved through no fault of the State's. In fact, it is the State, rather than appellant, that may rely in this case on the importance of the family insofar as it is the State that is attempting to foster the establishment and privacy of new and legitimate adoptive families.

the best interests of the child, at least in a situation such as this in which the natural family unit has already been destroyed, the father has previously taken no steps to legitimate the child, and a further requirement such as a showing of unfitness would entirely deprive the child—and the State— of the benefits of adoption and legitimation.[28]  As a matter of legislative policy, it can be argued that the latter reason standing alone is insufficient to sever the bonds that have developed between father and child.  But that reason surely avoids the conclusion that the order is arbitrary, and is also sufficient to overcome any further protection of those bonds that may exist in the recesses of the Due Process Clause. Although the constitutional principle at least requires a legitimate and relevant reason and, in these circumstances, perhaps even a substantial reason, it does not require the reason to be one that a judge would accept if he were a legislator.

## III

There is often the risk that the arguments one advances in dissent may give rise to a broader reading of the Court's opinion than is appropriate.  That risk is especially grave when the Court is embarking on a new course that threatens to interfere with social arrangements that have come into use over long periods of time.  Because I consider the course on which the Court is currently embarked to be potentially most serious, I shall explain why I regard its holding in this case as quite narrow.

The adoption decrees that have been entered without the consent of the natural father must number in the millions. An untold number of family and financial decisions have been made in reliance on the validity of those decrees.  Because

---

[28] See *Parham* v. *Hughes, ante,* at 353.  Cf. *Quilloin* v. *Walcott, supra,* at 255, quoting *Smith* v. *Organization of Foster Families, supra,* at 862–863 (STEWART, J., concurring in judgment).

the Court has crossed a new constitutional frontier with today's decision, those reliance interests unquestionably foreclose retroactive application of this ruling. See *Chevron Oil Co. v. Huson*, 404 U. S. 97, 106–107. Families that include adopted children need have no concern about the probable impact of this case on their familial security.

Nor is there any reason why the decision should affect the processing of most future adoptions. The fact that an unusual application of a state statute has been held unconstitutional on equal protection grounds does not necessarily eliminate the entire statute as a basis for future legitimate state action. The procedure to be followed in cases involving infants who are in the custody of their mothers—whether solely or jointly with the father—or of agencies with authority to consent to adoption, is entirely unaffected by the Court's holding or by its reasoning. In fact, as I read the Court's opinion, the statutes now in effect may be enforced as usual unless "the adoption of an older child is sought," *ante,* at 392, and "the father has established a substantial relationship with the child and [is willing to admit] his paternity." *Ante,* at 393. State legislatures will no doubt promptly revise their adoption laws to comply with the rule of this case, but as long as state courts are prepared to construe their existing statutes to contain a requirement of paternal consent "in cases such as this," *ibid.,* I see no reason why they may not continue to enter valid adoption decrees in the countless routine cases that will arise before the statutes can be amended.[29]

In short, this is an exceptional case that should have no effect on the typical adoption proceeding. Indeed, I suspect

---

[29] Cf. *Lucas* v. *Colorado General Assembly,* 377 U. S. 713, 739; *Roman* v. *Sincock,* 377 U. S. 695, 711–712; *WMCA, Inc.* v. *Lomenzo,* 377 U. S. 633, 655; *Reynolds* v. *Sims,* 377 U. S. 533, 585 (valid elections may go forward pursuant to statutes that have been held unconstitutional as violating the one-person, one-vote rule, when an impending election is imminent and the election machinery is already in progress).

that it will affect only a tiny fraction of the cases covered by the statutes that must now be rewritten. Accordingly, although my disagreement with the Court is as profound as that fraction is small, I am confident that the wisdom of judges will forestall any widespread harm.

I respectfully dissent.