375 So.2d 693 (1979)
Mary Agnes Pfister KIRSCH
v.
Wayne P. PARKER, Registrar of the Bureau of Vital Statistics of the City of New Orleans.
No. 10054.
Court of Appeal of Louisiana, Fourth Circuit.
August 10, 1979.
Rehearing Denied October 18, 1979.
*694 Victor J. Bradbury, Metairie, for plaintiff.
H. M. Westholz, Jr., New Orleans, for defendant.
Before REDMANN, BEER and GARRISON, JJ.
REDMANN, Judge.
A child due to be born in three to nine months may mean embarrassment, inconvenience, difficulty, or even tragedy for its mother-to-be. The mother may, however, be able to solve her problem: she may give the child up for adoption or, since 1973,[1] she may extinguish its embryonic life by abortion.
A three-year-old child may also mean embarrassment, inconvenience, difficulty or tragedy for its mother. Its mother, too, may be able to solve her problem by giving the child up for adoption.
But the mother of a three-year-old child may not extinguish its life.
That difference between the pregnant woman of today and the mother of years ago is a prime factor in our affirming a judgment enforcing plaintiff late-adoptee's right to access to her original birth certificate: notwithstanding Louisiana's recent pro-adoption, anti-abortion legislation,[2] plaintiff's certificate remains "sealed" by *695 law only against her blood parents and strangers.
The issues are of statutory construction and retroactivity.
Mary Agnes Pfister was nearing five years of age at her final decree of adoption in 1949. If her biological parents were then alive and if she meant a problem to them, they did not have the legal right to solve the problem by extinguishing the child's life. If the parents were living and gave Mary Agnes up for adoption, they cannot have done so with any expectation of secrecy. First, their identity as the parents of Mary Agnes was presumably known to her and to their acquaintances throughout three years or more and it was therefore impossible for full secrecy to be provided. Second, no statute promised them secrecy, and no statute authorized anyone to agree that state vital statistics records would be more "sealed" than the law itself allowed.[3]
In Louisiana before 1977, adoption records were always open to the adopted child and to the adoptive parents (and, until 1942, to the biological parents), and were "sealed" *696 only against busy bodies; Massey v. Parker, La.1979, 369 So.2d 1310; Chambers v. Parker, La.App. 4 Cir. 1977, 349 So.2d 424, writ refused La., 351 So.2d 170.
La. Acts 1977 No. 659 added to La.R.S. 40:81 A a requirement of "compelling reasons" for opening the records for adoptee or adopter, and limited the opening to the extent necessary to satisfy the compelling reason. When Mary Agnes Pfister filed this suit in November 1977, the 1977 amendment, effective September 9, 1977, made R.S. 40:81 A read:

Whenever a final decree of adoption shall be entered, the clerk of court shall forward, on a form supplied by the office of family services of the Department of Health and Human Resources, his certificate of the decree to the state registrar who shall make a new certificate of live birth of the person adopted, in the new name if the name has been changed in the decree. If the child is adopted by a single person and the surname of the child is changed, the word `adopted' shall be written on the new birth certificate. The state registrar shall seal and file the original certificate of birth with the certificate of the decree. This sealed package may be opened only on the order of a competent court either upon its own motion, or upon the demand of the adopted child or the adoptive parent, or the state registrar, for compelling reasons and only to the extent necessary to satisfy such compelling necessity. [Emphasis added.]
That plainly prospective language governed future actions: "whenever" an adoption decree is entered, the clerk and the registrar "shall seal" the birth certificate and the decree. And it is "This sealed package"one made by the registrar subsequent to the 1977 amendmentwhich may be opened on the adoptee's demand only "for compelling reasons."
Prospective interpretation of that 1977 amendment makes sense. The amendment was the product of pro-adoption and anti-abortion forces. Insofar as the amendment has the purpose of persuading pregnant women to elect adoption over abortion by promising undiscoverability not previously available, that purpose cannot be accomplished in respect to women who had already made their irrevocable election before the amendment was even introduced into the Legislature. That purpose is especially unachievable in the case of plaintiff's mother, who had apparently had her child three years before giving it up for adoption, apparently unconcerned with concealing its birth or her maternity, decades ago. A legislature could also have the purpose of providing a kindness to the blood parents of adoptees of years ago by now denying the adoptee access to the parents' identity, upon the hypothesis that blood parents would be offended, disgraced, or otherwise damaged by the adoptees' exercise of the right to discover the identity of their parents. We observe only that the 1977 Act did not, by its words, express such a purpose, and that to so interpret it would burden that Act with serious questions about overbreadth (in addition to other constitutional questions even its prospective purpose already raises).
Accordingly the trial judge's judgment of June 10, 1978 could easily have been affirmed on the basis that both the language and the purpose of the "compelling reasons" amendment of R.S. 40:81A in 1977 were prospective in intent, especially in respect to an adoption under the circumstances of plaintiff's.
La. Acts 1978 No. 450[4] and Massey v. Parker have intervened, however. The 1978 Act (effective September 8, 1978, after the trial court's June 10, 1978 judgment in this case) declares the provisions of R.S. 40:81 (containing the 1977 amendment) applicable *697 to all "adoption decrees" (sic) whenever rendered (thus not purporting to make R.S. 40:81 applicable to the original birth certificate sought by our plaintiff). Massey applied the 1978 Act to a case already decided by trial court judgment and already affirmed by the court of appeal before the Act became law.[5] Although the Louisiana Supreme Court holds that the Constitution of Louisiana or of the United States does not ordinarily apply unless the constitutional question was pleaded in the trial court, Summerell v. Phillips, 1971, 258 La. 587, 247 So.2d 542, failure to plead the unconstitutionality of the 1978 Act as applied is not a problem here because one can not, consistent with due process, be obliged to have pleaded in 1977 in the trial court the unconstitutionality of a 1978 Act that was not itself pleaded or even a possible issue because it did not exist then nor until after the trial court's final judgment.
Accepting that Massey would suggest general applicability of the 1978 Act (and therefore also of the 1977 Act) to earlier adoptions of newborns,[6] we would interpret the 1978 Act as not retroactive to the adoption of a three-year-old; otherwise we would hold its application to the adoption of a three-year-old unconstitutional as violative of state and federal due process and equal protection clauses.
In deciding whether the 1978 Act on "adoption decrees" intended to seal, against the child, its birth certificate because of its 1949 adoption when four or five years old, one major consideration is that an older child has already had a significant history of conscious life before its adoption (a distinction made in another adoption context by Caban v. Mohammed, 1979, ___ U.S. ___, 99 S.Ct. 1760, 60 L.Ed.2d 297). To declare that a child may not learn its pre-birth history is not to declare that it may not learn the history of its first few years of life.
A second consideration is the lack of sealing against the parties in the era of plaintiff's adoption. Not only was the sealing expressly not effective against adoptee and adopters, Acts 1942 No. 154 § 10, but, except in the case of foundlings, the blood parents had to be served with the petitions for both interlocutory and final decrees of adoption, Acts 1942 No. 154 § 7, Acts 1948 No. 228 § 12, unless the blood parents had previously executed a Notarial Act of Surrender, Acts 1940 No. 271, Acts 1942 No. 91. Thus either the blood and adoptive parents learned each other's identities or, at least, the fact that the blood parent(s) had a child and surrendered it for adoption was recited, typically with date and place of birth and other details, in a public act, which remains open to the public to this day. Interestingly, plaintiff herself testified that she knew from "a court order my adopted parents had" that she was born Mary Agnes Keller. (The adoptive parents are now dead.)
(Another open public record of infant adoptionsearlier than this adoption but indicative of Louisiana's earlier attitude towards concealing an adoptee's blood parentageis found in the land conveyance records, where, as required by Acts 1932 No. 46 § 7, every adoption until 1938 is recorded in an act signed by blood parents or custodian.)
Because of that statutory openness as between the parties, open public records of Acts of Surrender (and, earlier, of all adoptions), and especially because of the presumable openness of the blood parents themselves during the first 44 months or so of our adoptee's life, we concluded that the *698 1978 Act did not intend to deny to our adoptee and to other late-adoptees in similar circumstances the right to inspect their birth certificatesa right the law had always assured them.
A contrary interpretation of the 1978 Act would be invalid as a deprivation of liberty without due process of law and a denial of equal protection of the law, La.Const. art. 1 §§ 2 and 3, U.S.Const. Amend. 14.
The affected liberty of persons adopted as older children is the freedom to relive one's past, to return to childhood scenes, to retrace one's consciously lived history, in addition to the liberty perhaps claimable by all adoptees to know the identity of one's parents and blood family tree and to have access to state-kept vital statistics records of one's self and one's family that are open to every non-adopted person. The deprivation is without due process because no reasonable relationship exists between the pro-adoption, anti-abortion purpose of the 1978 Act and its application to persons who were already years into their existence when they were adopted decades before that act was passed. One may note the false basic premises of the Act that (a) all adopted persons were given up for adoption by their parents (the parents may have been dead); (b) the blood parents of all adopted persons have reason to deny the cited liberties to their children; and (c) all those parents want to deny those liberties to their children. The Act appears to assume that every mother who gave up her child was an errant teenager who has hidden her "shame" through decades and whose marriage (without mention of having had a child?) and happiness would be ruined by the child's appearingand that the now-adult child would not respect the mother's desire or need for secrecy as to others but would expose her to the world.
The denial of equal protection by an Act thus misconceived results from the radical overbreadth, as measured by its presumptively legitimate purpose, of the Act's classification of all adoptees, including children older when adopted decades ago (pretermitting consideration of the validity of a class of all newborn adoptees). The confidentiality statute's general purpose of encouraging adoption (especially over abortion) by making the identity of the mother (and father) inaccessible to the child[7] is presumably intended to be aided by now giving inaccessibility of identity even to blood parents who gave up their infants at a time when they did not have and could not expect anonymity. One overbreadth of the statute is that it also imposes inaccessibility upon children whose parents do not want it, including children who were adopted only because the parents had died leaving them homeless orphanschildren whose parents had no choice in the matter, and did not trade adoption for anonymity. More specific in our case is that the overbroad class includes children who were older when adopted and whose parents were known to others to be their parents and known by the children as such; and as to those parents there is little if any reason to suppose that they would ask the state, thirty or forty years later, to deny accessibility to birth records to their children. The state may constitutionally be able to trade a new life from birth to a newborn for its parents' anonymity, but it cannot give a new life from birth to a child who has already lived several years, and it cannot give sure anonymity to parents already so well known, and it cannot bury such a child's early life by thoughtlessly classifying the older adoptee with the newborn adoptee. Both state and federal constitutions require that laws treat all persons equally except insofar as *699 some legitimate legislative aim reasonably justifies unequal treatment on the basis of unequal factual characteristics of the unequally-treated classes. Under the Louisiana equal protection clause, the statutory discrimination must be "supported by [some] rational basis reasonably related to the governmental interest sought to be advanced. . . ." Succession of Robins, La.1977, 349 So.2d 276, 280. The United States equal protection clause, even on deferential scrutiny (if there must be two-tiered equality), "requires, at a minimum, that a statutory classification bear some rational relationship to a legitimate state purpose." Weber v. Aetna Casualty & S. Co., 1972, 406 U.S. 164, 172, 92 S.Ct. 1400, 1405, 31 L.Ed.2d 768. If a law's classification of adoptees for unequal treatment does not require the strict scrutiny applied to suspect classifications such as race, McLaughlin v. Florida, 1964, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222, and alienage, Nyquist v. Mauclet, 1977, 432 U.S. 1, 97 S.Ct. 2120, 53 L.Ed.2d 63, the classification of adoptees would at least require the less-than-strict but more-than-deferential scrutiny that applies to gender-based classifications, Reed v. Reed, 1971, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225, requiring a compelling state interest to justify it, Craig v. Boren, 1976, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397. Under either state or federal equal protection standards, the legitimate legislative purposes of promoting adoption and dissuading abortion today do not justify discriminating against a class that includes children who were adopted many years ago and who were several years old when adopted. The 1978 amendment to La. R.S. 40:80, expressly affecting earlier "adoption decrees", cannot constitutionally deny to adoptees of decades ago, several years old when adopted, access to their state-maintained original birth certificates.
We repeat that we construe the 1978 Act and Massey v. Parker as not governing the case of a person who was several years old when adopted prior to the Act. The constitutional problems in the contrary position but reinforce our construction.
Mary Agnes Pfister's entitlement to access to her original birth certificate is therefore not affected by the 1978 Act purporting to make the 1977 Act retroactive in some respects; and the 1977 Act is by itself prospective and does not affect her pre-existing entitlement.
Affirmed.
BEER, J., concurs in the result.
NOTES
[1] Roe v. Wade, 1973, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, reh. denied 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694, held invalid, as violative of U.S.Const. amend. 14, state law prohibiting abortion prior to viability of the embryo.
[2] The overhaul of the vital statistics law by La. Acts 1976 No. 352 included the series of anti-abortion measures of Acts 1973 No. 75, which developed pro-adoption support because freely available legal abortion reduces the number of live infants not wanted by their mothers and therefore available for adoption. The 1973 Act, a response to Roe v. Wade's legalization of abortion, required birth and death certificates for any aborted embryo that moved, R.S. 40:47, and a ten-part information form for every abortion, R.S. 40:62-67. The 1973 and 1976 Acts thus threatened the anonymity of abortion, by requiring records including the name of every woman who had an abortion.

Anonymity of a woman who had a child and gave it up for adoption was much more available: a birth certificate was made but kept in a "sealed package," R.S. 40:81, to be opened only by court order and only upon demand of the adopted child or the adoptive parents (or, prior to 1942, the blood parents). The 1976 overhaul made no change in this "sealed package" rule.
The tactics of exposing abortion while concealing adoptions led to Acts 1977 No. 569, in response to Spillman v. Parker, La.App. 4 Cir. 1976, 332 So.2d 573. Spillman first suggested, as we later held in Chambers v. Parker, La.App. 4 Cir. 1977, 349 So.2d 424, writ refused, La., 351 So.2d 170, that the simple requirement of a court "order" did not affect an adoptee's right to access to his sealed original birth certificatea right he had expressly had since the very first "sealing" statute in 1938. The 1977 Act evidently intended to defeat that Spillman dictum, and to deny access even to the adoptee himself, except for "compelling reasons," in order to safeguard more surely the blood parent or parents' anonymity. The 1930s worry that busybodies might learn that a child was adopted, or perhaps was illegitimate, first became the 1940s worry that the blood parents might find the child and cause problems, and now became the 1970s worry that the child might find the blood parents and cause problems: and, as in 1942 an amendment had ended the blood parents' former free access to the sealed package, in 1977 an amendment to R.S. 40:81 A ended the adoptee's former free access.
The first court test of the 1977 "compelling reasons" addition to R.S. 40-81 A purported to be presented by Larned v. Parker, La.App. 4 Cir. 1978, 360 So.2d 906. But Larned involved a pre-1938 adoption, expressly governed by R.S. 40:75-76 and not by § 81A, and we so held. (It is difficult to understand the state registrar's view of Larned, The pro-adoption-law could hardly expect to gain adoptable babies today from children born 40 years ago; the anti-abortionists could hardly expect to save from abortion today human embryos conceived 40 years ago. Yet the state registrar's brief recites that Acts 1978 No. 450 was a response to Larned and intends "that R.S. 40:81A is to be applied to all adoptions including adoptions prior to 1938 in the Larned era." This position is questionable: the 1978 retroactivity provision expressly applies to R.S. 40-78, 79 and 81, leaving §§ 75 and 76 untouched and Larned arguably unaffected. It must also be saidin regard to the rationality of any relationship between the amendment and its purpose of protecting blood parents' desire for or reliance on anonymitythat the blood parents of pre-1938 adoptees never had anything to do with obtaining a new birth certificate or sealing the old one: under Acts 1940 No. 269source of R.S. 40:75-76only the adoptive parents could do so.)
Our view is that not even the present case presents the question of whether plaintiff's are "compelling reasons." Plaintiff cited (in addition to the usual inheritance rights) an unexplained pre-adoption scar on her abdomen, serious genito-urinary problems, phobias, and haunting, unidentifiable childhood memories as her motives.
The overreaching of the anti-abortion, pro-adoption effort is most evident in the apparent attempt by Acts 1978 No. 450 to govern, or to take credit for, events of earlier decades. No embryo's life was saved from abortion for adoption decades ago because of a 1978 promise of maternal anonymity. Nor was 44-month-old Mary Agnes Pfister saved from murder or anything else in 1948 by a 1978 promise of maternal anonymity and Mary Agnes Pfister does not owe the 1978 pro-adoptionists anything. The pro-adoptionists' basic overreach is that, even as to adoptions in 1979 and later, they would prevent all identification of blood parents (even those dead before the adoption) sought by adoptees because some blood parents (how many is unknowable and immaterial) want no such identification. The statute forces upon every blood parent of an adoptee "protection" from the adoptee that the parent may never have wanted. The statute's purpose could be accomplished by letting the blood parents decide at the time of the adoption whether their identity should be accessible to the child, and their decision could be noted on the outside of the "sealed" package (still sealed against busybodies)preferably with some machinery for changing that decision in later life. (Similarly the child, after its majority, could be allowed to note on the package its willingness to have its blood parents know its identity.)
[3] Massey v. Parker, La. 1979, 369 So.2d 1310, 1315, speaks of "protecting the confidentiality which may have been guaranteed to the blood parent," hypothesizing some "obligation owed to the [blood] parent or parents arising from an agreement between one or both of them and those acting for the state or for the adoption agency. . . ." Massey does not explain how such a guarantee or agreement might have arisen. No one could lawfully have "guaranteed" or "agreed" to confidentiality against the demand of the adoptee or adopter before 1977. (Compare, analogously, the Supreme Court's refusal to honor law enforcement officers' promise of confidentiality to informers in Fryar v. Guste, La.1979, 371 So.2d 742, 746: "we feel compelled to make the further observation that access to such [otherwise non-confidential] reports may not be blocked by a simple statement from one of the investigators that persons furnishing information were assured of confidentiality. To permit such actions . . . would be, in effect, to allow bureaucratic procedures to abrogate the intent and purpose of the Public Records Act.") Nor does Massey explain how a newborn (or, worse, a four-year-old) could be bound by a contract to prevent it from learning its blood parents' identity. Did its blood parents purport to act for it in so flagrant a conflict of interest? Did its adopters-to-be purport to act for it with no legal authorization, to oblige it to waive a right the State by its law expressly preserved for it? Did some state employee?
[4] The Act amends R.S. 9:437 and 40:79 and 81 and enacts C.C.P. 5091.2, all to authorize appointment of a curator ad hoc. The retroactivity provision is an amendment of R.S. 40:80 (formerly providing "retroactivity" for R.S. 40:78 and 79, on new certificates for out-of-state adoptions of Louisiana-born children) to read "The provisions of R.S. 40:78, and 79 and 81 and R.S. 9:437 shall all apply to adoption decrees rendered at any time, prior to, as well as after, the effective date of this Chapter."
[5] Massey is even more curious in that it was also filed and had been tried and judgment rendered by March 25, 1977, before the 1977 Act added the "compelling reasons" language. (No application for rehearing was filed in Massey.)
[6] The Massey child in 1947 was about 18 months old at final adoption, which could not occur before the child had lived in the adoptive parents' home a year, or before six months after the interlocutory decree, Acts 1942 No. 154 § 7 (now R.S. 9:432 A). Thus that child cannot have been older than a few months when given up for adoption. Our child, born October 7, 1944, was 56 months old at final adoption June 13, 1949, and thus could have been as old as 44 months when given up for adoption (if that is what happened).
[7] That purpose is perhaps endangered rather than enhanced by the decades-later provision for retroactivity, because the pregnant woman of 1978 is told (correctly or not) that the law can be changed in the future, rather than guaranteed that the law will forever keep her records secret. Today's intelligent mother may recognize that her contract-like argument to preserve future anonymity is comparable to yesterday's mother's contract-like argument to preserve her accessibility to her child: "I gave up abortion for the law's `promise' of anonymity" is not different in kind from "I gave up my child for the law's `promise' that the child could identify me in the future if it wanted to."