In the Matter of the Adoption of
T.R.F., a Minor,

v.

Ray FELAN, Appellant.

No. 870307–CA.

Court of Appeals of Utah.

Aug. 30, 1988.

Jane Allen (argued), Salt Lake City, for appellant.

Bart J. Bailey (argued), Bailey & Nelson, Midvale, for T.R.F.

Before BILLINGS, GARFF and DAVIDSON, JJ.

## OPINION

BILLINGS, Judge:

This is an appeal from an order which permanently terminated appellant Ray Felan's parental rights and authorized the petitioners to proceed with the adoption of his child. The trial court found that Felan, prior to the filing of petitioners' petition for adoption, had adopted his child by acknowledgment pursuant to Utah Code § 78–30–12 (1987), and that he was a fit and proper person to have custody of his child. Nevertheless, the trial court permanently terminated Felan's parental rights. The court based its decision on Felan's

failure to file a notice of paternity under Utah Code Ann. § 78–30–4(3)(b) (1987), before the petitioners filed their petition for adoption, and on the "best interests" of the child. We reverse and remand.

Appellate review of a trial court's termination of parental rights is highly fact sensitive. Consequently, we review the facts of this dispute in detail. Felan's child was born on October 30, 1980, in Salt Lake City, Utah. Felan was stationed in Japan with the United States Marine Corps at the time of the child's birth. Felan and the child's mother were not married at the time of conception, nor did they marry after the child's birth. Felan is named as the child's father on the birth certificate and the child was given his surname. He is also identified as the child's father on the child's baptismal record.

Felan and the child's mother discussed marriage and having a child before the child was conceived. However, Felan at the time was married to another woman.[1] Felan purchased baby furniture for his child, including a crib, a playpen, a highchair, a rocker, and clothing, costing roughly $1200. When the child was about six-weeks old, the child's mother took the child to visit Felan in Japan for approximately two weeks. Felan and the child's mother remained in contact during his stay in Japan. When the child was one and one-half years of age, Felan was transferred to Twenty-nine Palms, California. While stationed at Twenty-nine Palms, according to the child's mother, "[Felan] would come [to Salt Lake City] often or I would go down there." The child's mother's job entailed traveling and she worked in Anaheim, California "a couple of times so that [Felan] could see [the child] and we could be together." During one of these visits, Felan had the child by himself for roughly a week while the mother attended business meetings. According to Felan, the relationship he had with the child's mother was like any other "military family." That is, they would see each other when they could, planning visits around where Felan was stationed. After his term in Twenty-nine

Palms, Felan was discharged from the military after twenty-three and one-half years of service.

In August 1983, after he was discharged, Felan returned to Salt Lake City where he resided with the child's mother and the child until December 1983. Thereafter, he moved to Austin, Texas where his parents and other relatives lived, to seek employment. The child's mother and the child went to visit Felan in Austin to celebrate the child's third birthday. It was important to both Felan and the child's mother that the child know Felan's relatives.

In January 1984, Felan accepted a position with the United States Postal Service and returned to Salt Lake City. Felan lived with the child's mother and their child from the end of January 1984 until May 1984 in the mother's rented house. Thereafter, Felan put a $15,000 down payment on a house where the child's mother, their child, and her other children resided. After Felan allegedly physically and emotionally abused the child's mother, the couple's relationship deteriorated. In December 1984 the mother, along with all of her children, moved out of Felan's home.

It is unclear from the record how often Felan visited his child after his separation from the mother. At first, the child's mother admits she did not tell Felan where she lived. Felan claims he accidentally discovered the residence of his child. Felan claims he thereafter saw the child's mother on a regular basis. Eventually he stopped seeing the mother, but he continued to see the child. According to the child's mother, Felan visited the child twice a month for two to three hours each time, and occasionally he would take the child on overnight visits to his home. Felan also took the child on extended trips by himself. For example, he took the child to Texas on two occasions and once took her to Las Vegas. Indeed, Felan took the child to visit his family in Texas for 22 days in August 1985, just five months before the petition to adopt was filed. Furthermore, Felan, the child's mother, and their child had a "family" picture taken in late December 1985,

1. Felan was subsequently divorced in August 1982.

just one month before the child's mother secretly consented to the child's adoption by the petitioners.

The trial judge found Felan had not provided his child with adequate financial support. Although at trial Felan produced cancelled checks made out to the child's mother totaling over $2,500, he never made regular child support payments. The child's mother never filed an action to enforce Felan's legal obligation to support the child. Felan did buy the child a bicycle and other items during the child's visits with him.

The mother underwent a mastectomy in May 1985. As a result of the mother's health, the petitioners began tending the child in August 1985. Further cancer was discovered in September 1985. The petitioners took physical custody of the child in January 1986. When the petitioners had custody, Felan's requests to see his child were often refused. When the petitioners learned the mother was terminally ill, they asked to adopt the child and the mother consented. On January 7, 1986, the petitioners filed a verified petition to adopt the child. Shortly thereafter, the mother filed her consent. Felan did not know of the mother's intention to relinquish the child for adoption nor of petitioners' desire to adopt his child until *after* the petition for adoption had been filed and *after* the child's mother's death.[2] Felan filed his acknowledgment of paternity the day after he learned of the petition for adoption. Felan insists the child's mother led him to believe he would be allowed to rear the child upon her death.

On September 17, 1986, Felan applied for a military identification card for the child, which entitles the child to military benefits such as commissary privileges, dental, health, and death benefits. Felan's employment records identify the child as one of his beneficiaries. The child is currently covered by Felan's medical insurance. The trial court specifically found that Felan satisfied the requirements delineated in section 78–30–12, Utah's acknowledgment statute:

> [Felan] by his actions has acknowledged that he is the natural father of [the child] and has acknowledged his paternity by residing with [the child's mother] and the child for extended periods of time and by allowing his name to be placed on the birth and baptismal certificates of the child indicating that he is the father of [the child]; and by further acknowledging to his own family and holding [the child] out to them as his child.

The trial court also found Felan to be a fit and proper parent:

> Each of the parties including petitioners and [Felan] are found to be by the court fit and proper persons to have custody of and to adopt [the child]; however, the petitioners and [the child] have developed a psychological relationship and bond which seems to the court to transcend the relationship which existed between [Felan] and [the child].

Thus, after finding that Felan had adopted the child by acknowledgment, that he held her out as his child, that he lived with the child and the child's mother for extended periods of time, and that Felan was a fit and proper person to have custody of the child and had developed a relationship with the child, the court, nevertheless, permanently terminated Felan's parental rights and allowed petitioners to proceed with their petition for adoption. The court based its decision on Felan's failure to file a notice of paternity before the petitioners filed their petition for adoption, and because the court believed such placement would be in the "best interests" of the child.[3]

---

**2.** The trial court found that Felan was unaware of the petition for adoption or the mother's consent thereto:

> [Felan] was unaware of and ignorant of the fact that a Petition for Adoption had been filed by the petitioners and [that the child's mother] had given her consent to said adop-

tion. He did not become aware of those facts until after the death of [the child's mother].

**3.** We are also troubled by the trial court's treatment of Felan, the child's natural father, throughout this procedurally protracted case. Felan, upon learning of the pending adoption proceedings, immediately filed an objection to

## I.

### STANDARD OF REVIEW

The pivotal question presented to this court concerns the proper interpretation of two statutes, namely the acknowledgment statute, Utah Code Ann. § 78–30–12 (1987), and the paternity statute, Utah Code Ann. § 78–30–4 (1987). This is a question of law and, therefore, we apply a correction-of-error standard with no particular deference accorded the trial court's construction. *Traylor Bros., Inc./Frunin–Colnon v. Overton*, 736 P.2d 1048, 1050 (Utah Ct.App. 1987). However, on appeal, we will not disturb the trial court's factual findings unless they are "clearly erroneous." Utah R.Civ.P. 52(a). The "clearly erroneous" standard, established by Rule 52(a), requires "that if the findings ... are against the clear weight of the evidence, or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made, the findings ... will be set aside." *State v. Walker*, 743 P.2d 191, 193 (Utah 1987). The Utah Supreme Court, quoting C. Wright & A. Miller, *Federal Practice And Procedure* § 2585 (1971), stated:

> The appellate court ... does not consider and weigh the evidence de novo. The mere fact that on the same evidence the appellate court might have reached a different result does not justify it in setting the findings aside. It may regard a finding as clearly erroneous *only if* the finding is without adequate evidentiary support or induced by an erroneous view of the law.

*Id.* at 193 (emphasis added).

## II.

### STATUTORY CONSTRUCTION

The cardinal rule in interpreting legislative enactments is "to assume that each term used in the statute was used advisedly." *Horne v. Horne*, 737 P.2d 244, 247 (Utah Ct. App.1987). Therefore, we interpret and apply the statute in accordance with its literal wording unless it is unreasonably confused or inoperable. *Id.*

It is presumed the Legislature intends to achieve a consistent body of law. 1A C. Sands, *Sutherland Statutory Construction* § 23.09, at 332 (4th ed. 1985). Thus, statutes relating to the same subject matter "should be construed with reference to each other and harmonized, if possible," so that effect is given to every provision of the statutory scheme. *Murray City v. Hall*, 663 P.2d 1314, 1318 (Utah 1983).

Utah's acknowledgment statute, codified at Utah Code Ann. § 78–30–12 (1987), provides, with our emphasis added:

> The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, *thereby adopts it as such, and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption.*

■ In order to legitimate a child, the acknowledgment statute requires an unwed father to fulfill the following requirements: "(1) public acknowledgment by the father, (2) receipt of the child into the father's family and (3) treatment of the child as legitimate." *Slade v. Dennis*, 594 P.2d 898, 900 (Utah 1979). Utah's acknowledgment statute and similar statutes in other jurisdictions "have historically been given liberal construction because of the law's

---

the petition for adoption. Felan sought an evidentiary hearing to determine permanent custody and to determine visitation privileges with his child while this case was pending. The trial court denied each of Felan's requests. Felan appealed this disposition to the Utah Supreme Court. On November 3, 1986, the supreme court granted Felan's request and remanded the case for a "hearing on the law and the facts." This evidentiary hearing was held on February 5, 1987, and was continued, per the parties' stipulation, on May 12 and 13, 1987. While this litigation was pending, the trial court continued to refuse Felan visitation with his child even though he had exercised visitation privileges with his child the child's entire life. This denial is problematic since the court had yet to decide who would have permanent custody of the child and it would seem in the child's best interests to maintain a relationship with her natural father until his parental rights were finally determined.

strong policy in favor of legitimation." *Id.* at 899.

> Courts in other jurisdictions, in interpreting statutes similar to [s]ection 78–30–12, have generally given liberal construction to these statutes in finding that the father has received the child into his family. It has generally been held that a father can satisfy the receiving requirement by accepting the child into his home for occasional brief visits. Further, some courts have not been insistent that the child actually be physically present in the father's home. The receiving requirement has also been met where the father temporarily resides with the mother and child, even for a very brief period. A father's custom of visiting the child at the mother's home has also been deemed sufficient.

*Id.* at 900 (citations omitted).

■ Based upon the foregoing authority, the trial court was justified in finding that Felan had acknowledged his child and thereby legitimated the child pursuant to the acknowledgment statute before the petition for adoption was filed. Felan received the child into his home for brief visits and on occasion his child would spend the night. Felan temporarily resided with the child and the child's mother. When possible, Felan also visited the child at the child's mother's home. Felan took the child to Texas to meet his family. He held the child out to the public and to his family as his own.

■ By its express wording, the acknowledgment statute provides the child is adopted and deemed legitimate from birth if the putative father has met the enumerated statutory requirements. Thus, any filing of a petition for adoption after an unwed father has met the statutory requirements, and with only the natural mother's consent, is a legal nullity. The father's consent is also required. To underscore this intention, the Legislature expressly states in the acknowledgment statute "that the other provisions of this chapter," i.e., *the paternity statute,* "do not apply to such an adoption."

■ The trial court, however, held that in order to maintain his parental rights established by compliance with the express terms of the acknowledgment statute, Felan must, in addition to the enumerated requirements, file a notice of paternity. We do not read the statutory scheme as mandating such a requirement. Rather, we harmonize the acknowledgment and paternity statutes by applying each according to its own wording and in the factual context each was intended to apply.

The relevant provision of the paternity statute, codified at Utah Code Ann. § 78–30–4(3)(b) (1987), provides in part:

> The notice may be registered prior to the birth of the child but must be registered prior to the date the illegitimate child is relinquished or placed with an agency licensed to provide adoption services or prior to the filing of a petition by a person with whom the mother has placed the child for adoption.

The Utah Supreme Court addressed the interplay between the acknowledgment statute and the paternity statute in *Ellis v. Social Servs. Dep't of the Church of Jesus Christ of Latter-Day Saints,* 615 P.2d 1250 (Utah 1980). In *Ellis,* the putative father claimed that by notifying the adoption agency of his paternity, by filing a notice of paternity, and by filing his writ of habeus corpus *after* the petition for adoption had been filed, he publicly acknowledged and thereby legitimated his child within the meaning of the acknowledgment statute. In *Ellis,* the Utah Supreme Court held the putative father had not acted timely in filing his notice of paternity. *Ellis,* 615 P.2d at 1254.

*Ellis* is factually distinguishable from the instant case as the acts claimed by the putative father in *Ellis* were not sufficient to satisfy the enumerated conditions in the acknowledgment statute. Furthermore, the language relied on by petitioners to support their position that the paternity statute has been grafted onto the acknowledgment statute must be interpreted in light of those facts. The pivotal factual distinction between *Ellis* and this case is the *timing* of the putative father's acts,

i.e., whether the father's acts satisfying the acknowledgment statute occurred before or after a petition for adoption has been filed. It is this distinction which allows *Ellis* to be read as harmonizing the acknowledgment and the paternity statutes.

The troublesome language of *Ellis* is as follows:

In *State in Interest of M* [25 Utah 2d 101, 476 P.2d 1013 (1970)], this Court upheld the express provisions of the [acknowledgment] statute and ruled that the putative father's right to custody of his illegitimate child is superior to all others, except the child's mother. However, in 1975, the legislature enacted a statute which effectively limited the time in which the putative father may assert those rights [the rights to legitimate the child under the acknowledgment statute] where the mother has relinquished her rights to the child.

. . . . .

Therefore, whenever the natural mother relinquishes custody of the child either to an agency or to an individual for purposes of adoption, in order to protect his rights under [the acknowledgment statute], the putative father must file a notice of paternity with the Bureau. Where he fails timely to act [i.e., previously legitimate the child under the acknowledgment statute, or file notice of paternity before the filing of the petition for adoption], he 'shall be barred from thereafter bringing or maintaining any action to establish his paternity of the child.'

*Id.* at 1253–54 (footnotes omitted). The supreme court concluded that the putative father's acts were not timely because he had not complied with either the paternity statute or the acknowledgment statute before the petition for adoption was filed. Every act the putative father claimed was sufficient to legitimate or acknowledge his child was done *after* the petition for adoption had been filed.

The language of *Ellis* need not be read, and indeed cannot constitutionally be read, to require a putative father to file a notice of paternity prior to the filing of the peti-

tion for adoption in a case such as this where the putative father has *previously* acknowledged the child within the meaning of the acknowledgment statute. To read *Ellis* to the contrary contradicts the express language of the acknowledgment statute, which states that other sections of the chapter, i.e., the paternity statute, do not apply to acknowledgment adoptions and that the child is deemed legitimate from birth.

Furthermore, to interpret the interplay between the acknowledgment statute and the paternity statute otherwise would be unconstitutional, as admitted by the supreme court in *Ellis* where the court states:

In [*Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979)] the unwed father appealed from decisions of the New York state courts which allowed his children to be adopted by their natural mother and her present husband without his consent and against his wishes. *The natural father had previously resided with the mother and had contributed to the children's support for a number of years, appeared as the father on their birth certificates, and maintained consistent contact with the children after separating from the mother. The United States Supreme Court held that under such circumstances, the permitting of unwed mothers, but not unwed fathers, to veto adoption of a child by withholding consent violated the Equal Protection Clause.*

. . . . .

The problem present in *Caban* is obviated in this jurisdiction by the provisions of [the acknowledgment statute].... *Where the father of an illegitimate child complies with the provisions of that statute, his rights with respect to the child are as though the child was born legitimate.*

*Id.* at 1255 (footnotes omitted) (emphasis added).

In the instant case, where the trial court specifically found that Felan, the unwed

**912**

father, had previously taken affirmative steps which satisfied the requirements of the acknowledgment statute, thereby legitimating his child *before* the mother relinquished the child and *before* the petition for adoption had been filed, our supreme court cautions that the unwed father's failure to file a notice of paternity is not fatal.

There is *no* basis for the trial court's conclusion that Felan's failure to file a notice of paternity before petitioners filed their petition for adoption was sufficient to terminate his parental rights after he had already legitimated his child by acknowledgment. The acknowledgment statute and the paternity statute can be harmonized to allow both to operate independently in the appropriate factual contexts. Where the acts which satisfy the requirements of the acknowledgment statute have *not* been undertaken prior to the relinquishment of the child or prior to the filing of the petition for adoption, then the putative father's failure to file a notice of paternity does defeat the father's right to claim the child. However, if the acts satisfying the acknowledgment statute are accomplished prior to the mother's relinquishment or prior to the filing of the petition for adoption, then the paternity statute is not applicable because the child is deemed legitimate from birth under the acknowledgment statute. The paternity statute is intended to apply to illegitimate children. This protects both the unwed father's constitutional rights and the important public policy of allowing speedy adoption of infants.

### III.

### CONSTITUTIONALITY

Our construction of the interplay between the acknowledgment statute and the paternity statute allows the statutory scheme to pass constitutional muster. An unwed father's constitutional rights to his child are a function of his relationship with his child. Our supreme court, relying on decisions by the United States Supreme Court, *e.g., Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), has attempted

to articulate the scale of protection accorded unwed fathers by stating that:

> [P]arents in different circumstances are apparently entitled to different degrees of protection for their parental rights. Parental rights are at their apex for parents who are married. Some variation exists among unwed fathers. While those who have fulfilled a parental role over a considerable period of time are entitled to a high degree of protection, unwed fathers whose relationships to their children are merely biological or very attenuated may, in some circumstances, be deprived of their parental status merely on the basis of the finding of the "best interest" of the child.

*In re J.P.,* 648 P.2d 1364, 1374–75 (Utah 1982) (citations omitted). *See Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 203 (Utah 1984).

The Supreme Court initially formulated a definition of the protected relationship in *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), wherein the Court stated:

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by *'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the Due Process Clause....* But the mere existence of a biological link does not merit equivalent constitutional protection.

*Id.* at 261, 103 S.Ct. at 2993 (citations omitted) (emphasis added). The issue then becomes whether the acts and circumstances are sufficient to conclude that the father has "come forward to participate in the rearing of his child."

We can best understand where Felan fits in the spectrum of constitutional protection by analyzing the facts of each relevant United States Supreme Court case and comparing them with those presented here.

*Quilloin v. Walcott,* 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), took place in Georgia. At the time, Georgia, like Utah, had a statute which allowed an

unwed father to legitimate his child. Unlike Felan, the father in *Quilloin* had failed to comply with Georgia's statutory requirements to legitimate his eleven-year-old child prior to the stepfather's filing a petition for adoption. The child had been in the mother's complete control for her entire life. The child's natural parents never lived together with the child. The natural father never had the child stay with him and never assumed any significant responsibility in rearing the child. The natural father never sought custody or visitation but merely wished to block the stepfather's petition for adoption and thus the legal formation of an already physically existing family unit. The Court emphasized the fact that any relationship between the natural father and child was tenuous, especially when weighed against the countervailing interests of the existing family unit. On these facts, the Court concluded the natural father did not have a "substantial relationship" with the child and allowed the natural father's parental rights to be terminated using a "best interests" standard.

In *Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), the mother of children born out of wedlock and her present husband sought to adopt the children. The children's natural father objected to the petition for adoption and counter petitioned for adoption. The Supreme Court held that the New York Domestic Relations Act's gender-based classification violated the equal protection clause where an unwed mother, but not an unwed father, was permitted to block the adoption of her child by withholding consent. The Court distinguished those cases where there was a "substantial parental relationship" and those cases where there was a mere biological relationship.

> The New York Court of Appeals in *In re Malpica-Orsini, supra,* [36 N.Y.2d 568, 370 N.Y.S.2d 511, 331 N.E.2d 486 (1975)], suggested that the requiring of unmarried fathers' consent for adoption would pose a strong impediment for adoption because often it is impossible to locate unwed fathers when adoption proceedings are brought, whereas mothers are more likely to remain with their children. Even if the special difficulties attendant upon locating and identifying unwed fathers at birth would justify a legislative distinction between mothers and fathers of *newborns, these difficulties need not persist past infancy.* When the adoption of an older child is sought, the State's interest in proceeding with adoption cases can be protected by means that do not draw such an inflexible gender-based distinction as that made in [New York's statute]. In those cases where the father never has come forward to participate in the rearing of his child, nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child.... *But in cases such as this, where the father has established a substantial relationship with the child and had admitted his paternity, a State should have no difficulty in identifying the father even of children born out of wedlock.*

*Id.* at 392–93, 99 S.Ct. at 1768–69 (citations omitted) (emphasis added).

In *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the putative father never supported and indeed had rarely seen his two-year-old child before the adoption. The father never lived with the child. The mother married eight months after the child's birth. Her new husband sought to adopt the child. The Court emphasized that the liberal New York acknowledgment statute provided an unwed father several means to establish his parenthood: the father could file with the state registry; the father could be identified on the child's birth certificate; or the father could live openly with the child and hold himself out as the child's father. The father claimed that under the due process and the equal protection clauses he was absolutely entitled to notice and an opportunity to be heard before the child could be adopted. The Supreme Court disagreed, ruling that because the putative father failed to comply with the acknowledgment statute and had not established a "substantial relationship" with the child, the failure to give him notice of the pending adoption

proceedings did not deny him due process or equal protection. The Court reasoned that the putative father could have guaranteed himself notice of the adoption proceedings by complying with the provisions of the acknowledgment statute. *Id.* at 265–66, 103 S.Ct. at 2995–96. The Court found that the acknowledgment statute adequately protected the putative father's inchoate interest in establishing a relationship with his child and, thus, found no merit to his claim that his constitutional rights were offended. *Id.* at 265, 103 S.Ct. at 2995.

Applying the foregoing authority to this case compels the conclusion that Felan has developed a "substantial relationship" with his child which merits constitutional protection. The facts in *Quilloin* are clearly distinguishable from those in this case. Here, Felan did not sit on his rights for eleven years of his child's life. Rather, he complied with the requirements of Utah's acknowledgment statute by publicly acknowledging the child and holding the child out as his own from the child's birth. He was identified as the child's father on the child's birth certificate and baptismal record. He and the child's mother established a home together after the child's birth. He continued to visit the child even after the parties' separation and he contributed to the support of the child. Unlike the natural father in *Quilloin,* he seeks actual and legal custody of his child.

The facts of *Caban* are more similar to those presented here. In this case, Felan, like the father in *Caban,* was identified on his child's birth certificate, the child is older, the natural parents and the child previously lived together, and Felan stayed in contact with the child despite Felan's separation from the child's mother. Indeed, the facts presented here are even more compelling than those in *Caban* because *Caban* involved an adoption by the stepparents; here, the adoption involves third parties unrelated in any manner to either Felan or the child.

Finally, in comparing *Lehr,* unlike the putative father there, Felan would have qualified under the acknowledgment statute because Felan was named on the child's birth certificate, Felan lived openly with the child's mother, and Felan held himself out as the child's father.

Furthermore, although the cases discuss whether the father contributed to the support of the child, there is no articulated requirement that the father "regularly support" the child.[4]

The facts in the record and the findings of the trial court based on those facts clearly indicate Felan established the requisite "substantial relationship" with his child prior to the filing of the petition for adoption. Because Felan had a "substantial relationship" with the child, the termination of his parental rights by application of the paternity statute or by a utilization of the "best interests" standard would violate his due process liberties.

■ Parental rights cannot be terminated by merely applying the "best interests" of the child standard but, rather, there must be a showing of the parent's unfitness, abandonment, or substantial neglect. *In re J.P.,* 648 P.2d at 1375.

> [T]he right of a parent not to be deprived of parental rights without such a showing is so fundamental to our society and so basic to our constitutional order ... that it ranks among those rights referred to in Article I, § 25 of the Utah Constitution and the Ninth Amendment of the United States Constitution as being retained by the people.
>
> This recognition of due process and retained rights of parents promotes values essential to the preservation of human freedom and dignity and to the perpetuation of our democratic society.

*Id.* at 1375–76.

■ In this case, the trial court deprived Felan of his parental rights based upon the "best interests" of the child, despite the fact that the trial court found Felan to

---

4. If "regular support" is a requirement that must be demonstrated in order to establish that a father has parental rights, then many divorced fathers who are not current in their support obligations could be subject to having their parental rights terminated under a "best interest" of the child standard.

have a relationship with the child and to be a fit and proper parent. In order to constitutionally terminate Felan's parental rights and allow the petitioners to proceed with their plans to adopt the child, the trial court would have had to determine Felan was unfit, or that he had abandoned, or that he substantially neglected his child. It did not. As previously pointed out, the trial court's result is not only at odds with Utah's statutory scheme applying to unwed fathers, but also unconstitutional, as Felan had established a "substantial relationship" with the child which merits constitutional protection.

We concede that stability in child placement should be a paramount value. However, "it cannot be the sole yardstick by which the legality of a particular custodial arrangement is judged. Such a standard would reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation." *In re Adoption of Halloway*, 732 P.2d 962, 971–72 (Utah 1986).

### IV.

### CONCLUSION

In conclusion, the legal question presented to this court concerns the proper interpretation of the statutory scheme applying to putative fathers with respect to the termination of their parental rights. We do not find the acknowledgment and paternity statutes inconsistent, but rather believe they operate independently in appropriate factual contexts. We interpret the statutes as follows: when the unwed father acknowledges his child, within the meaning of the acknowledgment statute, prior to the mother's relinquishment of the child or prior to the filing of the petition for adoption, then the father need not comply with the requirements of the paternity statute. However, if the claimed acts of acknowledgment occur *after* the mother's relinquishment or after the petition for adoption has been filed, then the paternity statute governs.[5] Where a parent has fulfilled parental obligations over a period of time, then the parent's parental rights are entitled to a high degree of protection. *Wells*, 681 P.2d at 203. There is no public policy favoring the termination of an unwed father's parental rights where the father has had a long-standing relationship with the child, is determined to be a fit parent, and where those seeking to adopt the child are strangers who have been deceptive in their adoption plans. By contrast, where the child is a newborn different policy considerations come into play. Utah's paternity statute applies to newborns who, by virtue of their age, cannot possibly have any relationship or attachment to their fathers. *Id.* In addition, there is a strong public policy favoring adoption of newborns.

Despite the foregoing discussion, we agree with the trial court that it *may* not be in the child's best interest to award Felan the right to rear the child. We have no doubt that the petitioners are and would continue to be appropriate parents. However, as we have noted, this case does not turn on what is in the child's "best interest." Parents have a constitutional right to rear their children. We could agree with the result reached by the trial court if it

---

5. Even if the acknowledgment statute is construed as requiring the natural father, in addition to those requirements expressly delineated, to file a notice of paternity in order to legitimate his child, then it was "impossible" for Felan to file the notice of paternity under the facts presented. *See In re Adoption of Baby Boy Doe*, 717 P.2d 686, 689 (Utah 1986); *In re of K.B.E. & T.M.E.*, 740 P.2d 292, 297 (Utah Ct. App.1987). Felan was led to believe there was no reason to protect his parental rights by filing a notice of paternity. On the contrary, everyone concerned, i.e., the petitioners and the child's mother, knew of his interest in the child. Indeed, according to Felan, the child's mother represented that he would get custody of the child upon her death knowing Felan intended to rear the child. The petitioners never told Felan of their desire to adopt the child until after the petition for adoption was filed and after the mother's death. Under the circumstances of this case, as in *Baby Boy Doe*, this was not "either a usual case or [one] that notice may be implied." *Baby Boy Doe*, 717 P.2d at 691. Therefore, Felan "has successfully shown 'that the termination of his parental rights was contrary to basic notions of due process, that he came forward within a reasonable time after the baby's birth, [such that] he should be deemed to have complied with the statute.'" *Id.* (quoting *Ellis*, 615 P.2d at 1256).

had determined that Felan had acknowledged the child but that he was not a fit and proper parent but had neglected or subsequently abandoned the child. Under these circumstances, the termination of Felan's parental rights would not be unconstitutional.

We, therefore, reverse and remand for proceedings consistent with this opinion.[6] We concede such a result may disrupt the child's stability. However, as previously discussed, the child's stability must be considered in relationship to the constitutional rights of Felan.

GARFF and DAVIDSON, JJ., concur.

---

6. We point out that this was an adoption proceeding governed by Utah Code Ann. §§ 78–30–4, –5 (1987), and not an action for custody. *See*

*Quinton v. Quinton,* 680 P.2d 22, 23 (Utah 1984) (Durham, J., concurring).