**In the Matter of the ESTATE OF William "Billy Joe" SCHELLER, Deceased,**

v.

**Michael PESSETTO, Appellant.**

**No. 880337–CA.**

Court of Appeals of Utah.

Nov. 14, 1989.

James E. Morton and Randall L. Skeen, Salt Lake City, for appellant.

Paul T. Kunz, Salt Lake City, for respondent.

Before BENCH, GREENWOOD, and JACKSON, JJ.

## OPINION

GREENWOOD, Judge:

Appellant, Michael Pessetto, appeals from the trial court's conclusion that he could not inherit from his illegitimate deceased child because he did not openly treat the child as his own as required by Utah Code Ann. § 75-2-109 (1978). On appeal, Pessetto claims section 75-2-109 is unconstitutional. We affirm.

Pessetto and Respondent, Jolene Scheller (Scheller), are the biological parents of the decedent, William "Billy Joe" Scheller (Billy Joe), who was born out of wedlock on August 10, 1981. During his birth, Billy Joe was deprived of oxygen for a period of time, causing him to suffer cerebral palsy with resultant spastic quadriplegia. As a result of that condition, Billy Joe died at the age of five, leaving an estate which consisted of settlement proceeds of a medical malpractice claim.

During Billy Joe's life, Scheller cared for him in her home and in her mother's home. Pessetto never had any contact with Billy Joe. In 1983, Scheller and the State of Utah commenced a civil paternity action against Pessetto. After trial, Pessetto was found to be Billy Joe's natural father and was ordered to pay $1,250 in back child support for the first two years of Billy

Joe's life. Pessetto paid the judgment for child support arrearage, but did not pay support thereafter. Also in 1983, Scheller filed a malpractice action against St. Benedict's Hospital and three physicians, alleging they were negligent in treating Billy Joe. The malpractice action was settled.

On August 14, 1986, Billy Joe died. In December, Scheller filed a petition for formal determination of heirs, seeking a determination that Pessetto was ineligible to inherit from Billy Joe. Scheller claimed that Pessetto could not inherit from Billy Joe because he failed to establish a parent-child relationship within the meaning of Utah Code Ann. § 75–2–109(1)(b)(ii) (1976), by failing to openly treat Billy Joe as his own and refusing to support Billy Joe. Pessetto, however, claimed that he could not find Scheller and Billy Joe, was prevented from seeing Billy Joe, and paid two years of child support. The court found that Pessetto did not refuse to support Billy Joe but paid court-ordered support and nothing more. The court also found that Pessetto did not openly treat Billy Joe as his own. Specifically, the court found that Pessetto made no meaningful effort to find Scheller and Billy Joe and did not ask Scheller at the time of the paternity hearing where he could find Billy Joe, how he was, or how he could visit him. Based on these facts, the court concluded that Pessetto did not openly treat Billy Joe as his own and therefore could not inherit through Billy Joe. This appeal followed.

On appeal, Pessetto claims that section 75–2–109(1)(b)(ii) (1) violates the equal protection clause of the United States Constitution; (2) violates the due process clause of the United States Constitution both substantively and because the statute is overly vague;[1] and (3) violates the equal rights provision of the Utah Constitution, art IV, § 1. The intestate succession provisions of Utah's probate code state that a child born out of wedlock is the child of the mother. Utah Code Ann. § 75–2–109 (1976). Section 75–2–109(1)(b)(ii) further states that for purposes of intestate inheritance, that child is also the child of the father if:

> [t]he paternity is established by an adjudication before the death of the father or is established thereafter by clear and convincing proof, except that the paternity established under this sub-section 1(b)(ii) is ineffective to qualify the father or his kindred to inherit from or through the child unless the father has openly treated the child as his and has not refused to support the child.

## EQUAL PROTECTION

■ We first consider whether section 75–2–109 violates the equal protection clause of the United States Constitution, which provides that no state shall deny any person within its jurisdiction the equal protection of the law. U.S. Const. amend. XIV, § 1. Pessetto argues that the statute violates equal protection because it permits a mother to inherit from her illegitimate child under all circumstances, but requires a father to meet additional criteria by demonstrating that he has openly treated the child as his own and has not refused to support the child before he may inherit. As a result, Pessetto concludes that the statute illegally discriminates on the basis of gender.

■ "State laws are generally entitled to a presumption of validity against attack under the Equal Protection Clause." *Parham v. Hughes*, 441 U.S. 347, 351, 99 S.Ct. 1742, 1745, 60 L.Ed.2d 269 (1979). Statutory schemes which are gender-based are examined on an intermediate level under the fourteenth amendment. *See Pusey v. Pusey*, 728 P.2d 117, 120 (Utah 1986); *Ellis v. Social Servs. Dept.*, 615 P.2d 1250, 1256 (Utah 1980). Gender-based classifications must serve important governmental objectives and must be substantially related to achieving those objectives in order to withstand judicial scrutiny under the equal protection clause. *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976). The principle underlying that test

---

**1.** Because a different result is not urged under the Utah Constitution for either the equal protection nor the due process arguments, we con- fine our analysis to the federal constitution. *See State v. Ashe*, 745 P.2d 1255, 1257 n. 2 (Utah 1987).

is that the legislature may not "make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class." *Michael M. v. Superior Court,* 450 U.S. 464, 469, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981) (quoting *Parham,* 441 U.S. at 354, 99 S.Ct. at 1747). Further, because the equal protection clause does not require that a statute apply equally to all persons or require things "different in fact . . . to be treated in law as though they were the same," the Court has upheld statutes where the gender classification reflects the fact that males and females are not similarly situated in some situations. *Id.* (quoting *Rinaldi v. Yeager,* 384 U.S. 305, 309, 86 S.Ct. 1497, 1499, 16 L.Ed.2d 577 (1966)).

Applying the above standard, the United States Supreme Court has struck down a statute which permitted a mother to veto the adoption of her children but did not permit the putative father a similar veto right. *Caban v. Mohammed,* 441 U.S. 380, 387–88, 99 S.Ct. 1760, 1765–76, 60 L.Ed.2d 297 (1979). In *Caban,* the father had admitted paternity and participated in rearing the children. The Court emphasized that if the father had not come forward to participate in raising the child, nothing in the equal protection clause would prevent the state from denying him the privilege of vetoing the adoption of the children. *Id.* at 392, 99 S.Ct. at 1768.

Similarly, in *Lehr v. Robertson,* 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983), the court stated that "[i]f one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a state from according the two parents different legal rights." *Id.* at 267–68, 103 S.Ct. at 2996–97. In *Lehr,* a putative father, who had never supported the child and rarely saw her in the two years following her birth, claimed that an adoption order was invalid because he was not given notice of the adoption proceedings. The father claimed that his equal protec-

tion rights were violated because he was not within the class of people to whom the statute affords notice of adoption proceedings. The Court held that the father's rights under the equal protection clause were not violated because he never established any custodial, personal, or financial relationship with the child. Due to the difference in the relationship between the mother and child as compared to the father and child, the court held that the state could accord the mother and father different legal rights.

Likewise, in *Parham v. Hughes,* 441 U.S. 347, 355, 99 S.Ct. 1742, 1747–48, 60 L.Ed.2d 269 (1979), the Court considered whether a statute which prevents a father of an illegitimate child from suing for his wrongful death unless the father acts to identify himself, undertakes his paternal responsibilities and makes the child legitimate, violates the equal protection clause. The Court upheld the statute, stating that it does not discriminate against fathers as a class, but distinguishes fathers who have legitimated their children from those who have not. *Id.* at 356, 99 S.Ct. at 1748. Thus, according to *Caban, Lehr* and *Parham,* a putative father who has not established a relationship with his child is not similarly situated with the mother and may be accorded different legal rights than the mother without violating equal protection. *See also In re J.P.,* 648 P.2d 1364, 1374–75 (Utah 1982).

In this case, we first examine the nature and importance of the governmental interest served by the statute. The state has an important governmental interest in the maintenance of a fair and efficient method of disposition of property at death. *Parham,* 441 U.S. at 357, 99 S.Ct. at 1748; *Lalli v. Lalli,* 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978). Because paternal inheritance from an illegitimate child may bear upon the issue of proof and the equities associated with the father's role in the child's life, the statute aids the state in preserving orderly distribution of a child's estate. The Uniform Probate Code includes the provision in question, and was drafted for the purposes of providing efficient estate administration and eliminating

outdated discrimination in inheritance laws against " 'half-bloods,' illegitimates, aliens, and females." Wellman and Gordan, *Uniformity in State Inheritance Laws: How UPC Article II Has Fared in Nine Enactments*, 1976 B.Y.U.L.Rev. 357, 360. We have found nothing to indicate a contrary or broader legislative intent by the Utah legislature in adopting the code. Without hazarding to create legislative intent where none is expressed, it is clear, however, that the statute serves a further purpose of encouraging, albeit for pecuniary purposes, development of an actual familial relationship between a proven father of an illegitimate child and his child. As in *Lehr*, an established relationship between father and child requires greater constitutional protection than situations where that relationship is absent. We find that the government's stated and implicit statutory objectives are important and valid objectives.

We next determine if there is a rational relationship between the statutory purposes and the statutory means. Pessetto argues that there is a gender-neutral statutory alternative which would similarly require mothers of illegitimate children to prove they have provided support and care. *See Orr v. Orr*, 440 U.S. 268, 283, 99 S.Ct. 1102, 1113–14, 59 L.Ed.2d 306 (1979). "The relevant inquiry, however, is not whether the statute is drawn as precisely as it might have been, but whether the line chosen by the [legislature] is within constitutional limitations." *Michael M.*, 450 U.S. at 473, 101 S.Ct. at 1206. The statute herein recognizes that mothers and fathers of illegitimate children are not similarly situated. *Parham*, 441 U.S. at 355, 99 S.Ct. at 1747. The identity of the mother of an illegitimate child is rarely in doubt. *Id.* at 355, 99 S.Ct. at 1747–48. In contrast, the father's identity is frequently unknown. It is possible, also, as in this case, that the father's identity becomes known only because the mother, or the state, forces the issue by filing a paternity action. In addition, the mother, because she physically bears the child, automatically is responsible for the child at least to the extent of deciding its immediate future. Further, she bears the physical, emotional and psychological ramifications of pregnancy and must decide whether to abort the child, raise the child alone or give the child up for adoption. If she decides to raise the child, she endures further financial, emotional and psychological responsibilities. The putative father who does not support the child or openly treat the child as his own assumes none of these responsibilities.

We conclude that the statute does not violate equal protection. It promotes legitimate state interests of providing efficient estate administration and promoting development of meaningful relationships between illegitimate children and their fathers and is based on situational differences between unmarried mothers and unmarried fathers. While the means chosen is not perfect, it lies within proper equal protection clause limits, which are broader in this instance because the statute addresses only noncompensatory financial interests,[2] and does not interfere with established family relationships.

## DUE PROCESS

Pessetto also asserts that section 75–2–109 violates the due process clause because it allows mothers but not fathers to inherit from their illegitimate children and because it is unconstitutionally vague. We address those arguments in the same order.

■ The fourteenth amendment provides that no state shall deprive any person of life, liberty, or property without due process of law. Our first inquiry is to determine the nature of the private interest that is threatened by the state. *Lehr*, 463 U.S. at 256, 103 S.Ct. at 2990. In *Lehr*, the Court examined the extent to which a biological father's biological relationship with his child receives protection under the due process clause. The court stated that

---

**2.** Inheritance from a deceased illegitimate child is more in the nature of a gift or a windfall, rather than financial compensation for such things as labor performed or injuries suffered.

*See Condemarin v. University Hosp.*, 775 P.2d 348, 353 (Utah 1989) (the right to be compensated for injuries involves a fundamental interest).

when an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in rearing his child, his interest in personal contact with his child is protected by the due process clause. *Id.* at 261, 103 S.Ct. at 2993. However, "the mere existence of a biological link does not merit equivalent constitutional protection." *Id.* Only if and when a relationship more enduring than the mere biological connection develops between the parent and child is that father entitled to protection against arbitrary state action as a matter of due process. *Id.; see also Caban,* 441 U.S. at 414, 99 S.Ct. at 1779 (Stevens, J., dissenting).

In this case, Pessetto never had any contact with Billy Joe during his life. The only contact Pessetto had with Scheller or Billy Joe was during the action to determine paternity, which the state and Scheller initiated. Further, Pessetto's payment of two years of child support was only paid after the court ordered him to pay child support. In addition, the court rejected Pessetto's claim that he tried to contact Billy Joe but was prevented from doing so. As the court noted, Pessetto did not attempt to establish contact with Billy Joe at the paternity hearing. Therefore, because Pessetto established only a biological link with Billy Joe and nothing more, we hold that he failed to establish entitlement to constitutional due process protections.

■ Pessetto also claims the language "openly treated the child as his own" is so vague that different people can arrive at different interpretations of the statute, therefore violating due process.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Statutory language should be sufficiently clear that people of ordinary intelligence can understand what is required for compliance. *Id.* at 104, 92 S.Ct. at 2298–99. However, absolute certainty is not necessary. *Id.* at 111–12, 92 S.Ct. at 2300–01. Furthermore, we will construe statutory language "to avoid constitutional infirmi-

ties whenever possible." *In re Boyer,* 636 P.2d 1085, 1088 (Utah 1981).

In this case, we find the statute sufficiently clear to convey what is expected of a father to openly treat a child as his own. While we have found no cases which specifically construe this language, related language was addressed in *Slade v. Dennis,* 594 P.2d 898 (Utah 1979). In *Slade,* the Utah Supreme Court discussed the meaning of "publicly acknowledging a child as his own, receiving it as such with the consent of his wife if he is married and otherwise treating it as if it were a legitimate child," which is found in Utah Code Ann. § 78–30–12 (1987). *Id.* at 900–01. The court found that those statutory requirements are met if the father has received the child into his home for brief visits, visited the child, and held the child out to the public and his family as his own. *Id.* at 900. *See also T.R.F. v. Felan,* 760 P.2d 906, 910 (Utah Ct.App.1988).

We find, similarly, that the statutory language "openly treated the child as his own" conveys a sufficiently definite standard to impart notice and allow a fact finder to reasonably resolve conflicts. A father who has held the child out to the public or his family as his own, developed a custom of visiting the child at the mother's home, or accepted the child into his home for occasional brief visits would satisfy the statutory requirement of openly treating the child as his own. Clearly, a father who has never contacted nor seen his child, and who has only paid child support as reduced to a judgment, has not openly treated the child as his own, even though he may have satisfied the portion of the statute requiring financial support. We, therefore, hold that section 75–2–109 is not unconstitutionally vague.

## EQUAL RIGHTS

Lastly, Pessetto claims the statute violates art. IV, § 1 of the Utah Constitution, Utah's equal rights provision, which states: "The rights of citizens of the State of Utah to vote and hold office shall not be denied or abridged on account of sex. Both male and female citizens of this State shall enjoy

equally all civil, political and religious rights and privileges." Utah and Wyoming are the only states which included an equal rights provision in their original constitutions. A number of other states adopted equal rights provisions during the 1970's, when the federal equal rights amendment to the U.S. Constitution was being debated, and most patterned their language after the proposed federal amendment. Annotation, *Construction and Application of State Equal Rights Amendments Forbidding Determination of Rights Based on Sex,* 90 A.L.R.3d 158, 164–66 (1979). Subsequently, the equal rights provisions in those states have been applied with varying standards, ranging from prohibiting any classification on the basis of sex, allowing differentiation only where a "compelling state interest" is found, to permitting discrimination where the classification is reasonably related to a legitimate state interest—that is, the equal protection clause standard discussed earlier. The 1979 A.L.R. article reports that Wyoming had not then applied its provision in any cases, "while the Utah courts have given no force to that state's provision insofar as sex discrimination is concerned. Thus, the Wyoming and Utah provisions seem to have provided women with no rights that have not also been provided in other states which have no such equal rights provision." *Id.* at 166–67.

In *Stanton v. Stanton,* 30 Utah 2d 315, 517 P.2d 1010 (1974), *rev'd on other grounds,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), *rev'd on other grounds,* 552 P.2d 112 (Utah 1976), *vacated on other grounds,* 429 U.S. 501, 97 S.Ct. 717, 50 L.Ed.2d 723 (1977), *rev'd on other grounds,* 564 P.2d 303 (Utah 1977), *reh'g denied,* 567 P.2d 625 (Utah 1977), the Utah Supreme Court upheld a statute which established the age of majority as eighteen for females and twenty-one for males under the state equal rights provision, stating

that it is permissible to classify people on the basis of sex if there is a reasonable basis for the classification and it is applied uniformly to those in each class.[3] *See also Turner v. Department of Employment Sec.,* 531 P.2d 870 (Utah 1975), *vacated on other grounds,* 423 U.S. 44, 96 S.Ct. 249, 46 L.Ed.2d 181 (1975). In *Cox v. Cox,* 532 P.2d 994 (Utah 1975), the court upheld the maternal preference for custody of young children under the equal rights provision, stating that the law need not "pretend to be unaware of and blindly ignore obvious and essential biological differences." *Id.* at 996. *Cox* was reversed, however, in *Pusey,* 728 P.2d at 117, where the court held that the maternal preference violated both equal protection and Utah's equal rights provision by using gender as the determinative factor in custody cases. However, the court did not state specifically the standard for analysis under the equal rights provision, noting that the maternal preference had been invalidated elsewhere under both an intermediate level of review under equal protection guidelines, and strict scrutiny. Therefore, it appears that prior to *Pusey,* the standard employed by the Utah Supreme Court for application of the equal rights provision was the same as that used under the Fourteenth amendment. *Pusey* utilizes a standard which is at least as stringent as the equal protection intermediate review for gender discrimination.

We are mindful of the principle of appellate review mandating a presumption of constitutionality. This principle was discussed in *In re Baer,* 562 P.2d 614 (Utah 1977),[4] where the court upheld a statute, since repealed, providing wives property rights not similarly granted to husbands, as follows:

It is only when statutes manifestly infringe upon some constitutional provision that they can be declared void. Every

---

**3.** In *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), the United States Supreme Court reversed under the equal protection clause of the fourteenth amendment.

**4.** Annotation, *Construction and Application of State Equal Rights Amendments Forbidding De-*

*termination of Rights Based on Sex,* 90 A.L.R.3d 158, 167 n. 25 (1979), states that *In re Baer* upholds the statute under Utah's equal rights provision. However, we are persuaded that the opinion rests on an equal protection analysis. *See In re Baer,* 562 P.2d at 616.

reasonable presumption must be indulged in and every reasonable doubt resolved in favor of constitutionality.

Laws must be uniform and classes of persons for or against whom the laws will operate must be established on a rational basis. Such classification must be reasonable and not arbitrary.

*Id.* at 616. There may be cases where application of a standard more stringent than that used under the equal protection clause would be justified. However, the Utah Supreme Court has not clearly done so to date, and the statute in this case does not affect a fundamental right, such as an established familial relationship. The statute prevents a father of an illegitimate child from inheriting from that child unless he has fulfilled minimum requirements of supporting and acknowledging that child.

It is true that a mother, under the statute, could abandon her child at birth and still inherit, and that the intestate succession provisions do not otherwise seek to allow only those who are deserving to inherit. However, we find that our analysis under the equal protection clause applies under the equal rights provision as well. Therefore, we hold that the statute does not violate Utah's constitutional equal rights provision.

BENCH and JACKSON, JJ., concur.